1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

- - - - - - - - - - - - - X          2:25-CR-337
RICHARD LUTHMANN,
                    Plaintiff
              Vs.                     Fort Myers, Florida
DANESH NOSHIRVAN,
                    Defendant         September 10, 2025
- - - - - - - - - - - - - X

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE NICHOLAS P. MIZELL
UNITED STATES MAGISTRATE JUDGE

RICHARD LUTHMANN
4199 Los Altos Court
Naples, Florida 34109
Appearing Pro Se

CHIAPPETTA TRIAL LAWYERS
BY: NICHOLAS A. CHIAPPETTA, ESQ.
2101 Vista Parkway
Suite 258
West Palm Beach, Florida 33411
Appearing for the Defendant

COURT REPORTER:Brandi A. Wilkins
          scalisba@gmail.com
          Fort Myers Federal Building
          2110 First Street
          Fort Myers, Florida 33901

2

THE CLERK:  Calling case 2:25-CR-337, Luthmann versus Noshirvan.

THE COURT:  Okay.  Good morning.  I'll I guess entertain appearances, so who is here for the plaintiff; right?

MR. LUTHMANN:  Richard Luthmann of 4199 Los Altos Court, Naples, Florida, 34109.  Good morning, Your Honor.

THE COURT:  Good morning.  All right.  For the defense?

MR. CHIAPPETTA:  Good morning, Your Honor. Nicholas Chiappetta on behalf of Danesh Norshirvan.

THE COURT:  All right, welcome.  Remind me how to say Mr. -- is it Noshirvan?

THE WITNESS:  Norshirvan.

THE COURT:  Norshirvan, okay.

THE WITNESS:  Yeah, thank you.

THE COURT:  All right, thank you.  Okay. Well, let's talk about what we're trying to do here today.  First, I want to try to keep this very focussed on a very limited issue.  Obviously we had the Rule 16 Conference that was scheduled back in July.  Mr. Norshirvan was not here.  I asked him to show cause why he wasn't here.  I found the written submission insufficient, non convincing standing

3

alone, so I wanted to give him an opportunity to come in and explain himself here in the courtroom, and that's really all we're here to do as far as that goes.

I want to stay very focussed on just he tells us in his show cause response that he received the Notice of Hearing and simply didn't calendar it and simply forgot to be here. I think we should focus on the credibility of that assertion. And really that's about it as far as, you know, any kind of testimony or evidence that kind of thing.

After we get past that, I'd like to talk about some of the things we talked about during the Rule 16 Conference when the defense wasn't here and, you know, keeping the case running along efficiently and that kind of thing and see if I can -- you know, my job principally in these cases as a magistrate judge is to keep these cases running as smoothly as possible.

I'm obviously aware of the other cases that you are involved in here in the Middle District of Florida, and I want to try to avoid some of the things we've seen in those cases in this one, and also, during any Rule 16 Conference, the rule provides that I can explore with you your efforts to resolve the

4

matter.  So I might take that up too while you are here and take maximum advantage of the fact that you are here.  I understand Mr. Norshirvan travels here from Pennsylvania?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.

THE WITNESS:  Yes, Your Honor.

THE COURT:  So it's a commitment for you to be here, and let's take full advantage of you being here, and Mr. Chiappetta, you come from Orlando area.  Right?

MR. CHIAPPETTA:  West Palm Beach, Your Honor.

THE COURT:  West Palm Beach.

MR. CHIAPPETTA:  Yes.

THE COURT:  All right.  Well, again, everybody is -- I know you come up here from Naples or thereabouts but everybody is taking a lot of time to be here, and I want to take maximum advantage of the fact that we are all here.  Okay.  Well, that's kind of the sequence of things.

So on the issue about, again, the failure to be here in July, I mean, I have the submission.  I think what I envision doing on that is maybe give Mr. Chiappetta an opportunity to offer any evidence you

5

might want to offer to try to I guess underscore the credibility of what was offered from Mr. Norshirvan in his show cause response Document 49, and I might have some questions as well, and I might give Mr. Luthmann an opportunity to ask a few questions and -- just to make sure maybe Mr. Luthmann's thought of something I haven't thought about about all of that, and then I'll probably end up taking it under advisement.

And I mean, it's -- Mr. Norshirvan you probably have maybe heard this but it's fairly standard practice when a party doesn't show at a hearing that if they're the plaintiff the case can be dismissed, if they're the defendant they can be defaulted right then and there, and that's not unusual at all for a state or federal court to do that.

So I think that's in the range of consequences for not being here.  Obviously there can be something much less than that.  So -- and if you are defaulted, it doesn't mean that there's any kind of -- you know, there's still a lot of work to be done.  It just means that the well pled allegations are deemed admitted, and to the extent they don't state a claim, the don't state a claim.  To the extent they do, we'd have a damages trial.  So it's not -- it wouldn't be the end of the case by no means but it

6

would be an adverse outcome for you if it were to go that far, but obviously there's arrange of lesser sanctions and I'll entertain argument on that as well.

Okay.  So with that, does anybody else have any suggestions about other things we should take up today or before exploring that issue?

MR. CHIAPPETTA:  Your Honor, there are two things.  First, if I may, would a brief opening be allowed?

THE COURT:  Okay, that's fine.

MR. CHIAPPETTA:  Just to state a few minor points.

THE COURT:  That's fine.  Frame what we're doing.  That's fine.

MR. CHIAPPETTA:  Okay.  And then the other thing is it came to my attention last night that Mr. Luthmann attempted to service my state court service email address instead of my email address I have on file for purposes of discovery and it's been quarantined, so since we are in front of the Court, I would ask that Mr. Luthmann reserve me those documents so that I have them and that I have an additional 30 days to actually answer discovery because I just found it last night, and I do have documentation to show they were quarantined.

7

THE COURT:  Okay.

MR. LUTHMANN:  Yeah.  If he could submit that, I'd like to take a look at it.  I'd love to see that.

THE COURT:  It was something that was -- you transmitted it last night?

MR. LUTHMANN:  Oh.  I transmitted a whole bunch of things to him.  I sent him the courtesy copy that the Court I copied as well so there's no question that he received all of the exhibits, the witness -- or the exhibit list.  There's no witness list.  I'm not calling any witnesses.  The issue with -- I have the digital stuff in in accordance with the local rules.

THE COURT:  Uh-huh.

MR. LUTHMANN:  So he has all of it.  I'm not hiding the ball here.

THE COURT:  Okay.  Well, let's just --

MR. CHIAPPETTA:  May I clarify?

THE COURT:  Yeah.  Let's stay focussed on one thing at a time.

MR. CHIAPPETTA:  All right.

THE COURT:  Talking about transmissions last night.

MR. CHIAPPETTA:  Yes.  This was not -- this

8

was not a last night transmission.  We discovered this last night.  This was served on I -- I'd have to look at the document to see the exact date but there are actual requests for discovery --

THE COURT:  Okay.

MR. CHIAPPETTA:  -- that got quarantined that we didn't see.  So I don't want anything to be deemed admitted or not answered or nonresponsive because it went to quarantine and my office only discovered this last night.

THE COURT:  I see.  All right.  So you're saying --

MR. LUTHMANN:  Chiappetta legal and service and Chiappetta legal are I guess representing to the Court that those email addresses are not good email addresses for him, but those are the ones that are listed on the docket sheet.  Nick@Chiappettalegal.com is actually on the ECF.  I have a copy of the civil docket sheet there and that's what I go off of, Your, Honor.  So where it says -- the only email on the sheet is Nick@Chiappettalegal.com.  If that's the case, I don't think I should bear the issue here.

THE COURT:  Yeah.  That's the email we have too.  So --

MR. LUTHMANN:  I don't know what this is.  I

9

really -- I'm going to hand it back to him but I'm going to reject it in total.

MR. CHIAPPETTA:  May I respond, Your Honor? I have checked the Nick@Chiappettalegal.com and I have not received a document or an email from Mr. Luthmann as it relates to that email address.  The one that I'm showing quarantine from is Service@Chiappettalegal.com, and that is what I'm showing here.

THE COURT:  Okay.  All right.

MR. CHIAPPETTA:  That is --

THE COURT:  Well, that's a discovery issue we can get to later.  We're talking about scheduling things and keeping cases running along efficiently, that kind of thing.

MR. CHIAPPETTA:  Okay.

TH COURT:  I think you said there was two things you wanted to --

MR. CHIAPPETTA:  It was just the brief opening.

THE COURT:  Oh, the brief opening.  Okay. All right.

MR. LUTHMANN:  On that point, I just want to make clear on the record then.  Is this Nick@Chiappettalegal.com address that's on the CM ECF,

10

is that a valid address?  I don't want there to be any problems in communication.  We had -- I had terrible problems with communication.  I explained this to the Court on July 17 talking to Mr. Norshirvan, and I had hoped that having an attorney would have resolved some of the issues of communication, and now I'm hearing the first thing we have is problems with communication.  So I just want to be crystal clear of what we're doing.

THE COURT:  Okay.  Well, what I heard was Nick@Chiappettalegal.com is a good email address for you?

MR. CHIAPPETTA:  It is, Your Honor.

THE COURT:  All right.

MR. CHIAPPETTA:  And Mr. Luthmann has had no problem communicating through that email address to me.  However, something in that attachment in that one service got flagged and got blocked through the service email address.

THE COURT:  Okay.  We can clean that up later.  All right.  Just about today and the primary issue for today, anything else before we get underway?

MR. LUTHMANN:  I have no problem with his opening.  I would like to just bring to the Court's attention I'm going to want to make objection -- I'm

11

going to want to try to admit request for judicial notice, make an oral application for judicial notice on two items and as well as make a blanket of relevance. I think the Court covered it already by caveating the issue but a blanket relevance argument under the Federal Rules of Evidence as related to the Court's order as to the scope of this case, and his exhibit list that he's already given in is already way outside the bounds because the conduct is the July 17 in or around, on or about conduct.

THE COURT: Right.

MR. LUTHMANN: I think that's what that's looking at.

THE COURT: I think what we need to talk about is our notice went out on June 17. Mr. Norshirvan tells us that he received it. So what I'm interested in hearing about is what happened between June 17 and July 17. That's what we're here to talk about.

MR. LUTHMANN: And so the exhibit list has 336 pages of internet posts that weren't by Mr. Norshirvan, so I don't see the relevance. I want to make that relevance argument, but I also would want to make the judicial notice arguments as well. So maybe that be -- and to the extent that he does have me on

12

his witness list, I'm not going to assert privilege. Not the fifth amendment privilege because that was resolved by Judge Steele in poo pooing their claims that there was federal witness intimidation. That was basically laughed out of the court on -- in the order on August 12. That will be covered in the judicial notice.

But there are other privileges related to reporters' privilege, trade secrets and HIPAA and some other issues that I would want to bring up so maybe after Mr. Chiappetta gives his opening, I'd like to give an opening to kind of outline that for the Court to save us time.

THE COURT: Yeah. Let's just a couple -- just a few minutes to kind of frame things and I would be somewhat surprised if Mr. Luthmann had any personal knowledge that would be relevant to the issue about why Mr. Norshirvan wasn't here on July 17, but we can explore that later when you attempt to call him as a witness.

MR. CHIAPPETTA: Okay.

THE COURT: All right. Do you want to go ahead and set the stage for a bit?

MR. CHIAPPETTA: Yes, Your Honor. Thank you.

13

THE COURT: Okay.

MR. CHIAPPETTA: May is please the Court, Your Honor. Just very briefly, Mr. Norshirvan is going to identify to the Court on the stand that he received notice, that there was a calendaring error in relation to his actual availability and that he didn't realize there was a conflict. That will be addressed through direct testimony.

He was in California on a family vacation with his children. That is undisputed. The outside of that, he is going to address issues with receiving mail while he was gone. He didn't receive several envelopes until after he had returned in relation to this case, and in addition to he does not actually receive any emails from Mr. Luthmann because of an ongoing pattern of harassment, and that's where the Substacks come in, and that was also found in the 1218 case at Document 454 and 459 where Judge Steele had found that Mr. Luthmann had disseminated information that directly resulted in my client's expert witness being harassed.

So we do have an issue here where before this suit was filed stemming back from mid 2024, Mr. Luthmann engaged in a pattern of conduct harassing communications whether they be via Substack, email or

14

otherwise and that has essentially put off my client and forced my client to block email communications from Mr. Luthmann entirely well before this case was even filed, and I'll let my client explain that in further detail but I just wanted to provide a very brief overview so the Court kind of understands where my client is coming from.

THE COURT:  All right.  Well, let me offer some thoughts about that.  Maybe we can streamline what will be presented because we're not so much interested in really communications between the parties.  We're really interested in the communication between the Court and the defendant and his, you know, efforts to stay apprised of orders of notices from the Court, and, you know, he admits that he received our notice.

I imagine he received all sorts of notices and orders from the Court, and we have been emailing them to him, not snail mailing them to him, so I think we just need to stay focussed on, you know, what -- I think he tells us he receives all of our notices and orders by email and we just need to figure out despite this email of them why he wasn't here.

MR. CHIAPPETTA:  Okay.  I was just confused because in your text order it says that he failed to

15

meet and confer about selecting a mediator, and that's where that would be relevant --

THE COURT: Okay.

MR. CHIAPPETTA: -- as it relates because as plaintiff Mr. Luthmann would have been required to initiate that.

THE COURT: True, but again also, our local rules and the civil action order we docketed in the case told everybody they need to do that. So again, that's another order and notice from the Court that the parties would have received saying you need to do this. You need to work together to select a mediator. So --

MR. CHIAPPETTA: I understand. I just wanted to --

THE COURT: Or also, you know, the efforts to participate in the 26F Conference, to submit CMR, I mean, all these kind of orders and notices are coming from the Court, not Mr. Luthmann, and yet they're not being followed. They're not being given the attention they're due.

MR. CHIAPPETTA: I understand, and my client will be apologizing to the Court for any oversights that have occurred.

THE COURT: Okay.

16

MR. CHIAPPETTA:  But in relation to actually initiating and selecting a mediator, that is plaintiff's burden, Your Honor, as far as I'm aware.

THE COURT:  Well, from our perspective, it's joint.  It's a joint burden on both of them to work together to select someone.  We want the case manager report to be developed jointly and filed jointly, and they need to work together to select a mediator together.  So it's incumbent on both of them to make that effort.

MR. CHIAPPETTA:  Understood, Your Honor.

THE COURT:  Okay.  All right.  Mr. Luthmann, any other thing just to set the stage for today?

MR. LUTHMANN:  I'll just go into this very briefly, the two points, the points on notice and the points on relevance just so we have some case law put on the record real quick so that I don't have to -- I'm referring back to it if I make the same objection two, three, five, twenty times depending on what Mr. Chiappetta decides to do.

I'm going to ask the Court to take judicial notice of Judge Steele's August 12, 2025 opinion and order in the 1218 case.  I'm going to do that and because the Eleventh Circuit has been clear that judicial notice may be taken of public records in

prior Court orders where their accuracy cannot reasonably be questioned.

I would cite Horn V Potter, 392 Federal Appendix 800-802 Eleventh Circuit 2010 as well as Bryant V Avato Brands, 187 F3d 1271 at 1278 to 79. That's the Eleventh Circuit in 1999. And Shahar V Bowers which is an on bock opinion 120 F3d 211-214 Eleventh Circuit 1997. We are not asking this Court to relitigate Judge Steele's case at all. We're only asking the Court to recognize adjudicate facts he found after a full evidentiary hearing.

THE COURT: Well, let me jump in there. The only thing I -- I think a lot of litigants lose track of this. You're right, and obviously I'm aware of Judge Steele's order just because it's from this Court and I'm aware of the other case here. I think I need to be aware of that in order to understand what's going on with this one, so I have read Judge Steele's order and -- but yes, obviously it's an order of the Court, something I'm aware of, but for me to take judicial notice of anything, it needs to be a fact that I'm adjudicating here. It needs to be -- it needs to bear on it.

MR. LUTHMANN: Yes.

THE COURT: So the facts I'm adjudicating

18

today are, you know, the defendant received our notice, says he forgot to calendar it and then for whatever reason never thought about it ever again.

MR. LUTHMANN:  Yes.

THE COURT:  And I think that's what I'm grappling with today, and I don't know what Steele would have said that deals with Norshirvan's state of mind between June 17 and July 17 about his need to be here on July 17.

MR. LUTHMANN:  I will tell Your Honor.

THE COURT:  All right.

MR. LUTHMANN:  There are two words, good faith.  That's the core of this hearing today.  And the core of that order is bad faith.  It's about lack of negligence.  It's about motus operandi, the way that Mr. Norshirvan operates, it goes to common scheme and plan.  It goes to intent.  It goes to malice.

These are issues that are throughout, and I have seven points.  That's all I would like to put up to the Court to offer the judicial notice for the purpose of this hearing.  The first is that Document 454, that's the document in the 1218 case.

THE COURT:  That's Judge Steele's order?

MR. LUTHMANN:  Yeah, Judge Steele's order.

THE COURT:  Okay.

MR. LUTHMANN:  At Page 2106 that the Judge took initial notice that Mr. Norshirvan is a mega influencer with millions of followers on Tiktok, Instagram and Youtube, and that's relevant here because he said in his affidavit he knew about this because it was on social media.  All right?  That's squarely relevant.  He found out about the Court that there was a hearing because of fervor on social media. That's a relevant fact.

He claims that -- and they opened the door about the fifth amendment.  Well, I would ask that Document 454, Judge Steele's order, Page 13 and 16 to 17, the Court found "none of the other evidence establishes any of Mr. Norshirvan's allegations." That's related to the witness intimidation.  That was the basis for the fifth amendment assertion of privilege.

I would not have Mr. Chiappetta or someone who is not as learned as him and doesn't understand the fifth amendment privilege try to cast aspersions where the fifth amendment was used as a profilactin measure fully within the rights and try to say that there was some type of bad faith in the assertion of an evidentiary privilege which obviously we know there's not.

20

Third, the opposing party's disclosure in that case the Court found was not in bad faith, and that's at 17 to 18.  So the Court made distinctions between bad faith conduct and good faith conduct or not bad faith conduct but not quite good faith conduct.

THE COURT:  Uh huh.

MR. LUTHMANN:  The fourth is Mr. Norshirvan's self -- he engaged in bad faith there, the egregiousness conduct.  Shouting, cursing at opposing counsel ending with F you when Judge Steele said "could only have been committed in bad faith."  That's page 29 to 30 of that opinion.  And then he -- the Court found that Mr. Norshirvan published false claims online.  He found the he accused the opposing counsel of racism and sexual harassment, and Judge Steele found that they were made "intentionally to incite his followers to engage in foreseeable harassment and intimidation".

THE COURT:  All right.

MR. LUTHMANN:  And so that's relevant because of what Mr. Chiappetta just said.  His claim is that he says that people are intimidating him.  He said that I'm intimidating him in the practice of journalism.  And so this is a pattern, a common scheme

21

or plan, that goes to lack of mistake or negligence. It goes to lack of good faith.  Two more points.

THE COURT:  I recall the subject or maybe the principal subject of that hearing and that order was that deposition of Mr. Norshirvan's wife.

MR. LUTHMANN:  Yes.

THE COURT:  And then he made some comments while that was being undertaken.

MR. LUTHMANN:  Well, he wasn't even supposed to be in the room.

THE COURT:  I understand.  So when did that deposition take place roughly?

MR. LUTHMANN:  You'd have to ask Mr. Chiappetta and Mr. Norshirvan.  They were there.

THE COURT:  Do you remember when that took place?

MR. CHIAPPETTA:  Um.

THE COURT:  I mean, was it taking place between June 17 and July 17 of 2025?

MR. CHIAPPETTA:  No, it was not.  Well before, Your Honor.

THE COURT:  Right.  Right, right, right.  So again, anyhow, I'm going to bear that in mind and probably end up taking this request under advisement.

MR. LUTHMANN:  No problem, Your Honor.

22

THE COURT:  But anything else on that?

MR. LUTHMANN:  That's on the issue with the judicial notice on Judge Steele's order.

THE COURT:  Right.

MR. LUTHMANN:  The other item, item number two, is the Chief Justice's 2024 year end report on the Federal Judiciary issued by Chief Justice John Roberts of the United States Supreme Court.  It's proper here because it's an official government publication whose authenticity cannot be reasonably disputed or really I don't think questioned in the Federal Courts.

Bryant V Avato Brands, 187 F3d 1271, that's Eleventh Circuit 1999, and the other cases that I had cited.  I'm not asking for judicial notice to be taken or offering the report for the truth of the allegations.  Instead I offer it to show that the Chief Justice and the Federal Judiciary itself has officially recognized the rising threats of doxing, intimidation, disinformation and violence against judges and judicial officials.

The recognition is an institutional fact, and it's directly relevant to this Court's task of protecting the integrity of these proceedings.  The report is important because of what it represents.

23

Chief Justice Roberts warned that intimidation now includes online attacks urging violence, doxing judges, publishing private home addresses can prompt harassment and armed visits.  We saw this with Justice Cavanaugh who they picked up a man who --

THE COURT:  Okay.

MR. CHIAPPETTA:  Your Honor?

THE COURT:  None of that is at issue for today.  I mean, we're here just to talk about he received -- he acknowledged his receipt of the notice and he failed to be here, and I'm not sure what Justice Roberts had to say about any of that.

MR. LUTHMANN:  And I would argue that also helps to --

MR. CHIAPPETTA:  Objection, Your Honor.

THE COURT:  Well, let him get his thought in.  I'll let you be heard.

MR. LUTHMANN:  I would say that it reflects a deliberate pattern of bad faith and the points that I had said before, lack of good faith, lack of mistake or negligence, intent and malice that are squarely relevant to these proceedings.  And then we'll offer other evidence and I'll have relevance objections.  I don't think the Court wants to hear -- does the Court want to hear that now or does the Court want to hear

24

that --

THE COURT:  Let's take it up as it happens.

MR. LUTHMANN:  Sounds good, thank you.

THE COURT:  All right.

MR. CHIAPPETTA:  Your Honor, we would just object to the relevance of the document and also that --

THE COURT:  About the Justice Roberts report?

MR. CHIAPPETTA:  That is correct, Your Honor, and Mr. Luthmann has not provided a certified copy so it lacks foundation or predicate.  At the end of the day, it's admissible for judicial notice in the form that Mr. Luthmann tries to present it in.

THE COURT:  Okay.  And then anything else about the Judge Steele order?  Do you want to say anything about that right now?

MR. CHIAPPETTA:  As it relates to the Judge Steele order, again, that too should be a certified copy.  He's lacking foundation and predicate for the Court to even consider it here today.  Outside of that, should the Court want to take judicial notice of it, it clearly finds that Luthmann disseminated information that led to witness intimidation.  So we would be okay with the Court taking judicial notice of

25

that.

THE COURT:  Well, like I said, I'm already aware of -- I'm already aware of the order.

MR. CHIAPPETTA:  Yeah.

MR. LUTHMANN:  Okay.

THE COURT:  And to the extent it's helpful at all for what I'm resolving today, I'm aware of it. It is an order that we entered here in the Fort Myers division.  All right.  So I'm aware of it.  Okay.  Mr. Chiappetta, what do you want to present?  Again, in response to the show cause order.

MR. CHIAPPETTA:  Your Honor, if I may call Danesh Norshirvan to the stand.

THE COURT:  Yes, you may.

MR. CHIAPPETTA:  Thank you, Your Honor.

THE CLERK:  Please raise your right hand.

D A N E S H   N O S H I R V A N, after having been duly called and sworn, testified as follows:

THE CLERK:  Thank you.  You may be seated.

THE WITNESS:  Thank you.

DIRECT EXAMINATION BY MR. CHIAPPETTA:

Q.   Good morning.

A.   Good morning.

Q.   Is there something that you wanted to say to the Court?

26

A.   Yes.  Your Honor, I apologize, and I apologize to you and to the Court.  I apologize for wasting your time.  I apologize for not being here, not responding. I promise that it was not intentional or malicious. As you can see, I've hired a lawyer.  I do take this very seriously.  I did have that trip planned a while back, back in May.  I think it predates this lawsuit possibly.

But I was not trying to avoid anything by any means.  I was -- the only thing I was trying to put out of my mind of course was any sort of harassment my family and I have been enduring and try to enjoy a family vacation with my widow mother in California that we don't get to see very often.  So again, I do apologize.

THE COURT:  All right.

Q.   All right.  Now, Mr. Norshirvan, you have previously provided statements in your declaration saying that you received --

THE COURT:  Mr. Chiappetta, bring that microphone closer to you so we can pick that up. Okay?

MR. CHIAPPETTA:  Apologies, Your Honor.

THE COURT:  Thank you.

Q.   Mr. Norshirvan, you had previously provided a

27

statement in your declaration saying you received notice from the Court on or about June 17 of '25 regarding a Rule 16B Conference; is that accurate?

A.    Yes.

Q.    All right.  And what happened after you received that notice?

A.    Well, this was coming about a month off of that hearing, the evidentiary hearing that has been referenced several times.  So in my mind, I have never been pro se before and I don't -- I'm not as good at the calendaring and all that, and so in my mind, I was planning on responding to all of these things, but also I was thinking that I don't know how long it's going to be until there's probably some sort of criminal recommendations for Mr. Luthmann.

In my mind I believed that that's where it was going to go, not that anyone had told me that or anything, but again, that's my own responsibility.  I miscalendared that and I didn't put it on my calendar, and I was just looking forward to the fun vacation.

I was really excited about going to Los Angeles.  My brother was going to be there too.  I haven't seen them in a very long time.  My kids haven't seen their grandma in a very long time, and I was just very focussed on this at the time.

28

Q.   All right.  And so because of the calendaring error, were you able to see that there was a conflict between the two dates?

A.   I didn't even look -- no, I didn't even consider that.  No.

Q.   Okay.  And now what date did you actually leave for the family vacation?

A.   On July 5.  We left on July 5 and we returned on August 5.

Q.   All right.  And what was the purpose of the family vacation?

A.   Again, it was to make sure that my children get to spend time with their grandma.  They don't -- because we're on different sides of the U.S., she's in California, I'm in Pennsylvania, she doesn't get to see my kids so often as much as we'd like to, and being she is all alone out there because my brother lives in another state and I live in another state, I just really wanted to make sure we spend a lot of quality time out there.

Q.   Okay.  And now when you came back did you receive letters?

A.   Well, the post office held all my mail of course, but when I went to the post office to retrieve my mail, yes.

29

Q.   Okay.  And do you happen to recall the dates of those letters?

A.   They were throughout July, yeah.  It was not exactly, but yeah, throughout July while I was gone.

Q.   All right.  And how did you find out you missed the Rule 16 conference?

A.   I don't -- I don't remember exactly.  I was -- I maybe saw something online or something, but it immediately caused me to go check, and then of course I was concerned and I reached out to you for help of because I didn't know what to do really.

Q.   Okay.  All right.  Now, the Court had mentioned that you have admitted receiving all email notifications from the Court; correct?

A.   Yes.  I must have received them, yeah, but I get a lot of -- I'm not making an excuse, I'm just telling the truth.  I do get a lot of things coming into my email in relation to Court but also like spam that have been signed up for.  Not saying who did it, but somebody had signed me up for a lot of spam.

Q.   Do you understand the emails that -- and letters that you are receiving the communications from the Court?  Do you understand what they're actually meaning?

A.   Not as well as Mr. Luthmann because he has

30

experience with legal matters, but I mean, not really.

Q.   Okay.

A.   But I mean, I could understand simple things of course, and I do understand that it was my mistake for not calendaring that.

Q.   Okay.  And just so we're clear here, as it relates to Mr. Luthmann, do you receive email communications from him?

A.   No.  As you mentioned prior, I do have Mr. Luthmann blocked.  He goes straight to my spam folder because prior to this lawsuit he sends -- he's sent me very vile messages accusing me and my family of horrible, unspeakable things and also just racist things that he sends.  It's just -- not just unpleasant but it's disturbing to look at.  It's a lot of what he posts publicly on his Substack as well. But I do my best to avoid --

        MR. LUTHMANN:  I'm going to object.  Is there a foundation for this diatron?  Has he produced anything besides his own statements that there are emails sent to him that are racist or that are threatening?

        THE COURT:  Okay, I understand.  I think the question was just -- again, we need to try to keep your answers tighter to the question presented.

31

THE WITNESS:  Okay.

THE COURT:  Because the question was pretty limited.

THE WITNESS:  Yes, Your Honor.

THE COURT:  It was just, ou know, do you receive emails from Mr. Luthmann, and yes or no on that would be great.

THE WITNESS:  I understand.

MR. CHIAPPETTA:  And if I may let the record reflect that Mr. Luthmann has CCed my client on multiple emails where the Court was also CCed that contained all of the communications in which my client was referring to here today.

THE WITNESS:  Uh-huh.

THE COURT:  We'll talk about that later too.

MR. CHIAPPETTA:  Yeah.  Thank you.  All right.

Q.   So you don't receive communications.  Now, for identification purposes, I am going to mark this document as Defendant's 1.  Oh, oops.

(The following exhibit was marked for identification: EXH Number 1)

MR. CHIAPPETTA:  May I approach, Your Honor?

THE COURT:  Yes.

Q.   Have you ever seen this document?

32

MR. LUTHMANN:  Hold on a second.  I would like to just get a clarification.  This was substantially what was attached to Mr. Norshirvan's affidavit?

MR. CHIAPPETTA:  That is correct.

MR. LUTHMANN:  Okay.  That's fine.  No objection.

MR. CHIAPPETTA:  Okay.

THE WITNESS:  Okay.  I got it.

Q.   Do you recognize the document?

A.   Yes.

Q.   What is the document?

A.   This is my itinerary for July.  It says here the date that this was forwarded to me from my wife.  It was -- I'm sorry.  I believe that's the date she took care of it for the receipt was May 2, 2025.

Q.   All right.  And does this appear to be a true and correct copy of your receipt for your ticket?

A.   Yes.  This is my receipt for my ticket.

Q.   All right.  And where are the receipts for your family members?

A.   That's not included.

Q.   Okay.  But they did go with you; correct?

A.   Yes.  I went with my wife, my children and my mother-in-law.

33

MR. CHIAPPETTA:  Okay.  All right.  Then if there's no objection, I would move Defendant's 1 into evidence, Your Honor.

THE COURT:  All right.  There is no objection?

MR. LUTHMANN:  I would object to the fact that we have a redaction.  I'd just like him to state for the record what was redacted and why.

MR. CHIAPPETTA:  The --

MR. LUTHMANN:  The redactions on the front, I don't know why they are there.

THE COURT:  Okay.  Well, see if we can get --

MR. CHIAPPETTA:  Your Honor, they are the front portion of an email address, and for purposes of pub filings, we've redacted it for PII.

THE COURT:  All right.

MR. LUTHMANN:  One of them is Danesh Norshirvan's email so that one I think is inbounds.  I would like to know what that email is.  That's part of the service to the Court.  It looks like a gmail address.  I would like to know if he's operating under that email address for Court notices.

THE COURT:  I don't think it's germane for what the exhibit is being offered for.  Any other

34

issues with it?

MR. CHIAPPETTA:  No.

THE COURT:  Okay.  Received.  Thank you.

(The following exhibit was received into evidence:

EXH Number 1)

MR. CHIAPPETTA:  All right.  May I approach again?

THE COURT:  Feel free to approach your own witness.

MR. CHIAPPETTA:  Thank you.

THE COURT:  You don't need to ask me each time.

Q.   All right.  Now, you had previously testified that you had blocked Mr. Luthmann's communications. Do you recall the date you blocked Mr. Luthmann's communications?

A.    That would have to have been -- I'm sorry.  That would have to have been some time last -- oh, gosh. Well, I remember specifically telling him to cease communications with me.  I remember having the police call him and tell him to cease communications with me. I remember having you actually ask him.  During all that time, I had had him blocked.  So I would say all throughout this year at least.  Maybe mid 2024.

Q.   Okay.  All right.  Now, what I have here is a

35

composite exhibit marked as D2.  May I approach?

MR. LUTHMANN:  Is this on the witness list?

MR. CHIAPPETTA:  This is on the exhibit list.

MR. LUTHMANN:  I object to this in total, Your Honor.  Outside of the scope of this hearing, the relevance inquiry that we have under Federal Rules of Evidence 401-402, United States V Glasser 773 f2d 1553.

THE COURT:  All right.  Well, it hasn't been offered to me yet.

MR. LUTHMANN:  Oh, sorry.

THE COURT:  Let's just see if you have any issue with him at least presenting it to his witness.

MR. LUTHMANN:  Okay.

Q.   Have you ever seen this document before?

A.   Yes.

Q.   What is it?

A.   It is our -- this is an example of the Substack articles that Luthmann -- defamatory articles that Luthmann makes about me, and this one looks like in relation to the 1218 case.

Q.   Okay.  And what date is that document?

A.   October 30.

Q.   Of what year?

36

A.   That would be last year.

Q.   All right.  And are you able to read the highlighted portion?

A.   Yes.  It says "Now we have been retained by a private party to investigate, news gather and publish on the story with potential for a documentary on social media and cancel culture."

Q.   Okay.  And that article was written by who?

A.   Richard Luthmann.

Q.   Okay.  Now, I'm just going to have you briefly review these and confirm.

MR. LUTHMANN:  I'm going to object to all of this outside the scope.  It's a waste of the Court's time.  He's going to go through two years of Substack selectively.  If he wants to have a record like this, then he should take Florida Gulf News, New York News Press, Family Court Circus.  Also my work on the Gateway Pundant that I've had published there and other places as well as the Frank Report.  So if you want to have a survey of my journalistic materials, we can do that and we'll do a full survey, or we can find it's a waste of time because it far out exceeds the cabin --

THE COURT:  All right.  Well, I'm just finding a little bit of latitude, but where are we

37

going with these exhibits?

MR. CHIAPPETTA:  We're going to keep it very brief.  We're just establishing Mr. Luthmann's ongoing harassment prior to this case simply, and also, because Mr. Luthmann had objected that my client's statements weren't predicated on documents, the follow up questions will be predicated on these documents.

THE COURT:  Well --

MR. LUTHMANN:  I'm going to --

MR. CHIAPPETTA:  As it relates to establishing excusable neglect for purposes of this particular hearing.

THE COURT:  Well, I mean, I've already heard that I guess he attempted to block email communications from Mr. Luthmann.

MR. CHIAPPETTA:  Yes.

THE COURT:  Sometime from mid 2024 I guess to the present.

MR. CHIAPPETTA:  And this is why.  He's not going to read any of these, Your Honor.

THE COURT:  I don't know if I necessarily really need why.  So -- because really I'm just focussed on he told me he got the notice.  He nevertheless did not appear.  I am really, really just focussed on despite receiving the notice why wasn't he

38

here a month later, and that's really about it.  So --

MR. CHIAPPETTA:  I mean, I'm not sure what else my client --

THE COURT:  I guess this is really showing that to the extent Luthmann was trying to, you know, communicate with him that would have maybe prompted him to focus more on the case and maybe be here, but this is cutting against that grain.  This is going the opposite direction.  This is saying you never -- you're basically saying here that he didn't get emails from Mr. Luthmann.

MR. CHIAPPETTA:  Well, this is --

THE COURT:  The why, I don't know why that matters to me.

MR. CHIAPPETTA:  Well, it matters because there was a pattern that establish -- there was a pattern of behavior as indicated in those documents where Mr. Luthmann had called my client a member of the China Communist Party.  They've called him a Jihad terrorist.  He's went on and said a bunch of other malicious things.  He's posted I guess simulated Only Fans photographs in there and has made other outrageous claims.

So I think the underlying basis for these documents really is just to show the Court the

outrageousness of what Mr. Luthmann's statements is what caused my client to essentially block him well before this case was ever filed and that's what -- that's what we are simply establishing here.

THE COURT:  Okay.  Well, obviously I can weigh in the balance that Mr. Norshirvan chose to block all these communications sometime prior to this suit being initiated.

MR. CHIAPPETTA:  Uh huh.

THE COURT:  And then maybe we should explore -- well, okay.  I guess maybe you are explaining maybe this is offering some context about because it would be a question that I'm thinking about asking is why didn't you unblock when you are involved in a lawsuit with Mr. Luthmann.  Now you need to communicate with him.

So I guess you're trying to maybe explain why he did not unblock, but nevertheless, I don't know if you can offer any rational for that because you need to communicate with your party opponent.  So it's a -- I know it's a tricky situation.

MR. CHIAPPETTA:  I would request just a little bit of leeway to allow this and maybe one more document to come in as it relates to the level of harassment that he's received.

40

THE COURT:  All right.  So these are all things written by Mr. Luthmann and published by Mr. Luthmann?

MR. CHIAPPETTA:  Yes.  They're admissions by a party opponent here.

THE COURT:  All right.  Well, let's -- I'm going to give him a little bit of leeway to kind of give some context, but it's a very limited reason why we are going down this road.  I think really it's going to go to why Mr. Norshirvan didn't unblock you once he was in a lawsuit with you.

MR. LUTHMANN:  I have another objection, just it's very technical.  It's that Mr. Norshirvan is using and and Mr. Chiappetta is using terms of legal art and I'd like to be clear that if terms are legal art are terms of legal art or if they are how Mr. Norshirvan feels.  Harassment is a crime but he might feel harassed.  I have no problem with saying he feels harassed.  That's his state of mind, but let's make clear what's harassment as a state of mind, harassment as a crime, defamatory.

THE COURT:  Understood.  No, I'm taking it how you perceive things.

MR. LUTHMANN:  Okay.

THE COURT:  Not necessarily a settled fact

41

or anything like that.

MR. CHIAPPETTA:  Just a very brief rebuttal. To the extent possible, we -- in addition to how Mr. Norshirvan is feeling, we are potentially claiming under the Florida Cyber Stalking Statute actual cyber harassment.

THE COURT:  You're contemplating a potential counterclaim?

MR. CHIAPPETTA:  Oh, there will be counter claims if this suit survives, Your Honor.

THE COURT:  All right.  Well, we'll see if we get that far.

MR. CHIAPPETTA:  All right.

THE COURT:  All right.  So again, let's just -- I think we've kind of established that to the extent this is helpful for me about what we're doing today it really goes to why Mr. Norshirvan didn't unblock Mr. Luthmann when this suit was initiated.

MR. CHIAPPETTA:  Yes, Your Honor.  Thank you.

THE COURT:  I still have some questions about that because I feel like I've seen in the things filed with us some e-mails back and forth between them, so I don't know if his effort to block has been entirely successful.  It seems like they have engaged

42

in written communications with each other.  So you might want to clarify that as well.

MR. CHIAPPETTA:  Okay.

THE WITNESS:  May I?

MR. CHIAPPETTA:  Well, one thing at a time. Let me get through the documents and then we'll address this question.

Q.    Okay.  So as it relates to the initial documents I asked you to review, do you know what they are?

A.    Yes.  They are all about me and my family.

Q.    What are they?

A.    This is Richard's articles that he publishes and emails that -- and physically mails in some cases that is defamatory, harmful, upsetting material about me and my family.

Q.    Okay.  And where does Richard Luthmann publish those?

A.    He publishes online on Substack.

Q.    Okay.  And are you able to give just a very brief few examples of statements made within those articles by Mr. Luthmann?

A.    Yes.  Ones that stick out specifically --

MR. LUTHMANN:  I'm going to object to the foundation.  Unless he's testifying from personal knowledge, this is hearsay and there's no foundation

for his statements.

THE COURT: No. I overrule. They are admissions of a party opponent to the extent we're -- the documents themselves and now we're just talking about their content.

MR. LUTHMANN: I would object to that as well because they have not differentiated within that stack of documents things authored by Richard Luthmann, coauthored by others or authored people who are not Richard Luthmann.

So I would like a chance to voir dire those documents to pick out those things and sort them into the categories if they are going to say they're party opponent admissions what are Richard Luthmann, what are Richard Luthmann and others and what are non Richard Luthmann. Mr. Chiappetta has failed to do that, and that's why this entire line is objectionable based upon this evidentiary premise.

THE COURT: Okay. We'll take those up if they're offered into evidence.

MR. CHIAPPETTA: Okay. We'll address that.

Q. Do you know Mr. Luthmann's pen name? Do you recognize Mr. Luthmann's pen name, M. Thomas Nash?

A. Yes. Yes, that's him.

Q. Okay. Do you recognize the pen name Rick

44

LaRiviera?

A.   Yes.  They're all him.

MR. LUTHMANN:  Objection.  Basis.

THE COURT:  Well, okay.  Again, let's try to stay -- this is a pretty narrow issue I'm grappling with today, and maybe I want to caution Mr. Luthmann. I said earlier I questioned whether or not any examination of you today is even relevant to anything.

MR. LUTHMANN:  Okay.

THE COURT:  But an objection like that might end up making you testify today relevant.

MR. LUTHMANN:  Okay.

THE COURT:  So let's be careful about the positions we take.

MR. CHIAPPETTA:  I would just agree, Your Honor, because I would like to have Mr. Luthmann testify to one of his company names which is Rick LaRiviera on Sun Biz.

THE COURT:  I'm sorry?

MR. CHIAPPETTA:  Mr. Luthmann owns a copy Rick LaRiviera LLC on Sun Biz.

MR. LUTHMANN:  That's untrue.

THE COURT:  Okay.  Well, let's take that up when we need to get to it.

Q.   Okay.  So Mr. Norshirvan, are you able to briefly

45

identify a few of the statements that Mr. Luthmann has provided within those Substack articles?

A.    Throughout these statements, he consistently refers to me as some sort of -- someone with some sort of mental illness or mental disorder.  He calls me a racist.  He refers to me as a pedophile.  He -- just like every horrible thing that he could possibly imagine, he -- it's very upsetting to look at.  He makes horrible accusations about my wife who does not even have an online presence.

Q.    Has he equated your wife to utilizing black face?

A.    Yes, he did.  He took a photo of my wife in zombie makeup with like the eyes whited out, like white out contacts, flesh hanging from the skin from the production of Night of the Living Dead where the character Judy canonically dies in a car explosion and becomes a zombie.

She's covered in soot.  This was an on stage play.  It's done every year.  It's a fan favorite. It's a cult classic, Night of the Living Dead, Georgia Baro.  The sad part is that Judy comes in at the end with Tom who blew up in the truck explosion as zombies with again flesh hanging from their skin, and he compares this monster to black face.  He said this is an image of someone doing black face which I find very

disturbing in many ways, one, to even make that mistake, but two, like that's defamation of my wife.

Q.   Now, Mr. Norshirvan, just very carefully, have you ever seen Mr. Luthmann publish any photographs from your former Only Fans account?

A.   Yes.  He would publish simulated photos and claim that it -- just making crazy claims about it, that it's evidence of pedophilea, that it's evidence of some sort of abuse or something, and then he distributes that anywhere and everywhere he can with these defamatory lies.

Q.   Did Mr. Luthmann ever accuse you of violating federal law?

A.   Yes.  Yes.

Q.   Okay.

A.   He makes up randoms.

THE COURT:  Okay.  Can I ask a point of clarification on that?  And Mr. Chiappetta, you can follow up if you like.  Mr. Norshirvan, you said simulated -- Luthmann made reference of simulated photos of this Only Fans account.  So are you saying you generated this simulated content and put it on Only Fans or he created simulated content and attributed it to your Only Fans?

THE WITNESS:  Oh.  The image that I posted

47

up was people simulating sexual acts, and he didn't -- I'm not saying he had anything to do with like generating anything. I'm not making a claim of AI or something.

THE COURT: Okay. I see. Okay. Understood.

MR. CHIAPPETTA: Your Honor, at this time, I would move Defendant's 2 into evidence.

MR. LUTHMANN: I'm going to object, outside the scope, that the Court has already annunciated relevance. I've already stated for the record 401, 402, 403, Federal Rules of Evidence.

THE COURT: All right. And again, these are a collection of what? 12, 15, 20 articles.

MR. CHIAPPETTA: Somewhere -- I don't have an exact number. I mean, I can count if you want, Your Honor, but yeah. They're all articles posted on Richard Luthmann's Substack authored by Richard Luthmann and also some under pen names like M. Thomas Nash or Rick LaRiviera all believed to be Mr. Luthmann, and they all address my client in a very, very false negative.

THE COURT: All right. They're just being offered for going to Mr. Norshirvan's state of mind about whether or not he wanted to block or unblock

48

communications with Luthmann?

MR. CHIAPPETTA:  Correct, Your Honor.

THE COURT:  All right.  For that limited purpose, I'll take them in.

MR. CHIAPPETTA:  Thank you, Your Honor.

THE CLERK:  Thank you.

(The following exhibit was received into evidence:

EXH Number 1-2)

Q.   All right.  And so I guess my next question is what the Court's question.  After having explained what you have done so far, why did you not unblock Mr. Luthmann when Mr. Luthmann filed a lawsuit against you?

A.   Because Luthmann -- Mr. Luthmann continues to within whatever Court things that he's sending me send me horribly abusive even disguised in a lot of these Court required emails, at the end he'll say that because he doesn't believe I can speak English he's going to translate it all into Farsi for me, and then he'll repaste the whole thing in Farsi as if I cannot speak English.  He knows full well I can speak English, but all of it is just -- in my opinion, it is a roose to force proximity to me when I'm trying to get away from him.

Now, as far as Court things go, you're

49

right.  I did try to respond to some things that I felt I had to meaning not really respond but like things that the Court had to have me do whether it was saying to Luthmann, okay, do you want to settle this?  Do you have a settlement offer?  And then seeing those offers disingenuous or, you know, underhanded, I would go, okay, I'm not going to waste time with this anymore, stop contacting me, but any communication I've had with Luthmann I only had because I felt that I had to for this Court and I wanted to make sure I was respecting this Court.

The miscalendaring, I would not have purposely done that.  I made a mistake, I did, but also when dealing with Luthmann it gets me very uncomfortable.  This is all like -- this isn't just the papers that you've got.  This is very upsetting and it's very upsetting for me because it includes people that I love and it says horrible, awful things about them which hurts a lot more of course than what it says about me.

Thinking about these things or even being near this man is difficult for me.  Mentally, emotionally.  I physically am like shaking looking at those forms.  I don't understand the kind of cruelty.  I would never do that to anybody else.  No matter how

50

much I hate them, I could not obsess over people for that long and that excessively. It's hard.

It's really hard, and so I am doing my best, and, you know, as you can imagine for me, it feels very unfair being forced to have to answer to this person from my position at least, and I do -- but I do understand that it's not about answering to him, it's about answering to you and I do want to do that because I intend to show you, prove to you that this man is the one being malicious and I'm just trying to do my best here.

I mean, my lawyer, he's also my lawyer in my other cases as well. We're both spread thin, and I believe that's the purpose of this. I believe that's why he filed this lawsuit. This is a man who has called me a pedophile over and over -- not my lawyer but Luthmann has called me pedophile over and over again, and when we were at the evidentiary hearing, he rushed me --

THE COURT: I think you might be getting too far off the question.

THE WITNESS: I'm sorry.

THE COURT: So let's go back to more of a Q and A.

THE WITNESS: I'm sorry, Your Honor.

51

MR. CHIAPPETTA:  I apologize, Your Honor.

THE COURT:  Uh-huh.

Q.   Okay.  Now, just as it relates to ongoing harassment, can you tell me about the letter your YMCA received on August 30, 2025?

MR. LUTHMANN:  Objection.  How does he have personal knowledge of what the YMCA did?  It's going to be a hearsay response.

MR. CHIAPPETTA:  Okay.  I'll rephrase the question.

THE COURT:  All right.

Q.   Are you aware of a letter your YMCA received?

A.   Yes.

Q.   How?

A.   They brought it to my wife's attention because it was an envelope that included photos of myself and my wife claiming that we're pedophiles and having our name and address and our faces printed on it, and it was sent to several businesses around my town and it matches the exact type of harassing and defamatory language that Luthmann uses in the Substack articles and the kind of harassment I've been facing.

MR. LUTHMANN:  Objection.  He has not made the connection to why the YMCA sent it to him.

MR. CHIAPPETTA:  Okay.  So we'll go back.

52

Q.    What happened after the YMCA received the letter?

A.    After they received the letter, they immediately notified my wife, and my wife came and spoke to her boss about it because we have -- unfortunately have to become accustom to this type of harassment and how to address it as soon as it happens.  So that's how we became aware of it.

Q.    And has --

MR. LUTHMANN:  I'm going to object.  It's a fact out of evidence here.  Does he work at the YMCA?  Is there some connection?  I'm not getting that.  He hasn't put that into evidence.  I want to hear the connection with the YMCA and why a third-party would hand him the letter unless he has some knowledge of the person.  I don't understand what's going on here.

Q.    What is the size of your town?

THE COURT:  I think this is just going again kind of that state of mind thing we were talking about a minute ago, and I don't think I want to belabor the point too much more.

MR. CHIAPPETTA:  Okay.

THE COURT:  But is there anything much more different from that event to what we already talked about with these Luthmann articles?

MR. CHIAPPETTA:  Yes.  This event is

53

significantly more severe because there was multiple letters --

THE COURT:  When was it?  Just so I can maybe get an idea about --

MR. CHIAPPETTA:  This was August 30.  This was a couple weeks ago, ten days ago.

THE COURT:  Oh.

MR. CHIAPPETTA:  11 days ago maybe.

THE COURT:  Okay.  Let's not -- I don't think that would be helpful for what we are talking about today.

MR. CHIAPPETTA:  Understood, Your Honor.

THE COURT:  Okay.

MR. CHIAPPETTA:  Then are you -- Your Honor, if I may request, are you able to refresh my memory of that other question that the Court had?

THE COURT:  No.  Well, yeah.  When you are done, I'll probably ask a few and you can follow up and Mr. Luthmann can follow up as well.

MR. CHIAPPETTA:  Okay.

THE COURT:  But yeah, I think we're primarily concerned again with --

MR. CHIAPPETTA:  Okay.  So I think I have it.

THE COURT:  He had the notice and he

54

nevertheless wasn't here and I'm trying to understand why in that four week interim despite any other notices and orders he might have received from us and other communications from Mr. Luthmann, in that entire one month span nothing caused him to circle back and actually see the conflict on his calendar or apprise us about the conflict.

MR. CHIAPPETTA:  Okay.

Q.   So just to be clear that it was not -- that you never calendared the Rule 16 Conference date; correct?

A.   I did not do that.

Q.   Okay.  So you couldn't go back and see it on your calendar or a conflict; correct?

A.   Correct.  I -- yes.

Q.   Okay.  Now, setting that aside, I believe the Court had mentioned seeing you respond to Luthmann's emails at some point in time.

A.   Uh huh.

Q.   Are you able to explain how that occurred?

A.   Yes.  As I actually touched on it earlier, I wasn't responding to his specific emails.  I was just sending him an email, and if I did, it was just go to my Spam, grab the most recent one I see and respond to it because I saw on the docket and I was trying to do my best on my own here that there was certain things I

55

needed to do.

I believe I had to meet and confer or something. I had to see if there was a chance for a -- what is it calls -- a settlement -- not settlement but a resolution. So I asked him if he has a genuine offer because I felt that I was supposed to do that, but that's what that was. I was responding because I was making an effort to respect the Court's deadlines and I just made a mistake of course. I was negligent about the --

Q. Okay.

A. -- the hearing.

Q. So just to be clear, your testimony here today is that when you want to respond to Mr. Luthmann or feel the need that you have to respond to Mr. Luthmann, you go to your Spam email account and you pull up an email and then you write a -- write something and send it directly to Mr. Luthmann?

A. Yes. Yes.

Q. Okay. Okay.

MR. CHIAPPETTA: Your Honor, I don't think I have any further questions for Mr. Norshirvan.

THE COURT: All right. Well, let me ask -- let me kind of ask some points of clarification along these lines.

56

Mr. Norshirvan, you said the vacation was from July 5 to August 5?

THE WITNESS:  Yes, Your Honor.

THE COURT:  And during that time you still had access to your email?

THE WITNESS:  I would still have access to my email during that time, yes.

THE COURT:  All right.  I take it at least some time during that one month span you were probably corresponding with folks by email?

THE WITNESS:  I don't actually use email too often, but I do have access to my email during that time.

THE COURT:  Okay.  All right.  So I think you've already told us that obviously the Court has been emailing you.  Until Mr. Chiappetta appeared, all of our orders and notices have gone to you directly here.

THE WITNESS:  The Court will send me mail, physical mail.  As far as mail through email, I believe you had -- you had said that you had been emailing me and I agreed with you.  But again, I don't -- my email is -- like it's just full of Spam and stuff, and I don't -- I don't recall receiving the actual notice through email.  I just recall the

57

physical one which, yeah, I did receive.

THE COURT:  All right.  And because we sent this notice out June 17 and that notice refers to things that were previously referred to in the order we docketed back in April, our civil action order where we tell the parties that they need to get together, they need to talk about discovery in the case and put together a case management report for the case, those kinds of things.

THE WITNESS:  Your Honor?

THE COURT:  And then we continue to refer to that civil action order and a couple more orders after June 17.  So I'm trying to understand why given that civil action order from April that you would have received before June that would have put you on notice about the need that, you know, there's going to be a conference here about a schedule.

You're going to have to talk to Mr. Luthmann about discovery in the case, and then we sent you two more orders after June 17 that remind you of that initial order from April.  Why that wouldn't have jogged your memory about the June email or -- yeah, the June email that gave you notice of the hearing. Why wouldn't that have caused you to recall, oh, I have to be in Court in July.

58

THE WITNESS:  Again, Your Honor, once I had -- I need to put it on my calendar immediately and I failed to do so which I will not do again.  Again, I hired a lawyer to make sure I don't make these kind of mistakes again, but I will say that I -- I was not -- I believe during that time there was also a omit where Mr. Luthmann had to rewrite or his claim or something. If I'm not mistaken, he had to rewrite it or redo something, and so I think that probably added to my confusion of whether or not this is something that is happening because, again, it's not like it was in the back of my mind.  I failed to calendar that, and I apologize for that, Your Honor, but I -- there's a lot of different elements with that and then also the evidentiary hearing the month before and me just kind of hoping, you know, that this is -- you know, you hope for the best when you are in Court.  It doesn't always work out the way you want but you do hope for the best, and I did hope that after he pled the fifth to witness intimidation that hopefully I would not have to --

MR. LUTHMANN:  Objection.  This is a narrative.  You want to tell a story, you go into (inaudible).

THE COURT:  Yeah.  Let's stay focussed on

59

the question I asked you.

THE WITNESS:  Sorry.  From my perspective, I thought this would not be someone I would have to worry about any longer.  I understand now that that's not how that works, and so there was just other factors in there that was while you make the argument, yes, that there's things that should have reminded me, yes, it should have.  There were also things that were making me think that, hey, I'll finally be free of this guy.

THE COURT:  Hmm.

THE WITNESS:  Which is what I hold onto.

THE COURT:  You are involved in the two other cases here in Fort Myers.

THE WITNESS:  Uh-huh.

THE COURT:  And are you involved in any other lawsuits currently?

THE WITNESS:  No, Your Honor.

THE COURT:  Okay.

THE WITNESS:  No.

THE COURT:  And then prior to being involved in these three lawsuits that we have in Fort Myers, had you been involved in other litigation?

THE WITNESS:  Nothing more than like it was like a car accident, a minor fender bender one back

60

like ten years ago, or like something about getting my deposit back or something with real estate, but again, small -- no, nothing like this. Nothing -- no civil action to this degree. I have no criminal record. I don't -- yeah.

THE COURT: Okay. The prior matters that you mentioned like sounds like a real estate deposit and what was the other thing again?

THE WITNESS: Yeah. Another one was a fender bender.

THE COURT: Oh, yeah. Okay.

THE WITNESS: Yeah.

THE COURT: So were you always represented by counsel in those matters or did you handle them pro se?

THE WITNESS: For that, there was insurance to deal with whatever happens with the -- I don't remember or recall what had happened but I believe I was 18 or 20 at the time. The other time -- or no, in my 20s, and the other time, the real estate thing, that was not for me. I worked for a company and they would send their -- their real -- their lawyers but my name was only on it because the -- say if like the tenant put my name on it because I was the one they were giving rent to but I had no part of it, so no.

61

THE COURT:  Okay.  All right.  Just trying to get a feel for your litigation experience.

THE WITNESS:  Yeah.  I understand, Your Honor.

THE COURT:  And well, and also after we sent this notice out in June and before you were represented by counsel, you filed a few things between June 17 and July 17, and again, I'm curious why if you are filing things in the case, you are attending to the case, why that didn't cause you to think about the notices from the Court in mid June that you needed to be here in mid July.

THE WITNESS:  Yes fair question, Your Honor. I did what I believe -- I was filing and responding to everything I believed that I was supposed to be filing or responding to.  That only shows that I was ignorant of that and didn't -- wasn't considering it because I didn't think it was a matter.

I possibly thought because he had to rewrite his that maybe something like that would have gotten pushed, I can only speculate, but it -- it is likely because I didn't think that there was anything for me to do in that regard because I miscalendared.

THE COURT:  If you see it from our perspective, that's a bit confusing that if you keep

62

filing things with us, why isn't that reminding you about a notice that you received from us?

THE WITNESS:  Of course, Your Honor, and I'm grateful that you allowed me the opportunity to try to explain myself the best I can.

THE COURT:  All right.  I think those are the questions that were generated when I read your show case response, and -- oh, and then all right.  So when this litigation gets initiated and now you know you are a party, you were obviously representing yourself for a while.  You know when the lawsuit starts that you have blocked communications with someone who now you're engaged in litigation with, and yet I understand what you've offered as far as your state of mind about why you don't -- again, some of your thoughts about why you don't want to review emails from Mr. Luthmann, but I want to see if you have any explanation about why you didn't apprise the Court about that predicament.  You know, why not tell us I'm involved in this lawsuit with someone with whom I've blocked communications and here's why and is there any other way we can come up with a way for the parties to, you know, communicate.  I never got anything like that from you.  So why not?

THE WITNESS:  I didn't know I could do that.

63

I would have sent that to you right away, Your Honor. There's a lot I have to say, but I don't want to, you know, bombard you. I want to do it the right way. I apologize.

THE COURT: All right. Mr. Chiappetta, did anything I ask cause you to want to follow up in any way?

MR. CHIAPPETTA: No, Your Honor.

THE COURT: All right. Mr. Luthmann, do you want to ask -- do you have any questions that we haven't already explored about this?

MR. LUTHMANN: I do. I do.

THE COURT: Again, this very limited issue.

MR. LUTHMANN: I'll go very briefly. Yes, Your Honor. Okay.

CROSS EXAMINATION BY MR. LUTHMANN:

Q. Okay. Just to confirm, your name is Danesh Norshirvan?

A. Yes.

Q. Okay, and do you go by any other names?

A. No.

Q. Is your middle name John?

A. That's not a real name, no.

Q. Have you ever gone by Danesh John Norshirvan?

A. I have written that down before, yeah.

64

Q.   Oh, so you do go by other names besides Danesh
Norshirvan?

A.   No.  John is a term of endearment in Farsi.  It
means dear.

Q.   Okay.

A.   So -- and we commonly use it.  So Danesh John is
something my mother calls me, but that's not my middle
name.

Q.   But you've been referred to that by others, so
others --

A.   Other Persian people may call me that or I may
refer to myself as that because that is a term of
endearment.  It's not a name.

Q.   Okay.  So you've never used the name Danesh John
Norshirvan.  Others just used it about you?

A.   Are you still confused about this?

          MR. CHIAPPETTA:  Objection.  Misstating
facts.

          THE WITNESS:  Are you still confused about
this, sir?  John is not a name.

          MR. LUTHMANN:  So Danesh John Norshirvan --

          THE COURT:  Hold on.  Just a second.

          MR. LUTHMANN:  John is not a middle name?

          THE COURT:  I have an objection.  I got to
at least say something about it.  I'm going to

65

overrule it for now, but let's not spend too much more time about this name issue.

MR. LUTHMANN:  Okay.  I'll move on.

THE COURT:  And maybe slow down a little bit so the Court Reporter can catch everything.

MR. LUTHMANN:  Sorry.

THE COURT:  And if there's an objection, I can say something about it before you ask any other questions.

Q.   Who is Erica Sabonis?

MR. CHIAPPETTA:  Objection, relevance.

THE COURT:  Okay.  Where is this going?

MR. LUTHMANN:  That's a name that I believe that he's used before as a sock puppet or catfish.  So he just said on the record he doesn't use any other names besides Danesh Norshirvan, and there's evidence in the 1218 case that Mr. Chiappetta knows all about that Erika Sabonis was a sock puppet name that was used by Danesh John Noshirvan, and he admitted that in his depositions.

THE COURT:  All right.  All right.  Mr. Chiappetta, anything else?

MR. CHIAPPETTA:  Your Honor, Mr. Luthmann is attempting to litigate on behalf of Jennifer Couture and Ralph Garramone, issues in the 340 case and the

66

1218 case that have zero relevance to the June 17 Rule 16 discovery conference. Absolutely irrelevant.

THE COURT: All right. Well, I'll allow a little bit of latitude about some basic biographical about Mr. Noshirvan including his name and any other names he goes by.

MR. LUTHMANN: I'm asking that now only, Your Honor, because I just asked him do you go by other names, he said no, and then I asked Erica Sabonis, the name that he goes by --

THE COURT: Understood.

MR. LUTHMANN: -- and he lied.

MR. CHIAPPETTA: Objection.

THE COURT: Well, hold on.

MR. LUTHMANN: In my opinion.

THE COURT: Hold on. I don't think we have an answer yet. So I'll let you ask the question.

MR. CHIAPPETTA: Objection to the extent Mr. Luthmann is testifying.

THE COURT: Understood. Understood.

Q.   Who is Erika Sabonis?

A.   I don't know. I've used an account with that name. I've never gone by Erica Sabonis.

Q.   Okay. So you make a distinction then between using an account with a name and going by a name; is

67

that correct?  Is that fair?

A.   So Erica Sabonis does not exist.

Q.   Does Danesh Norshirvan exist?

A.   I'm standing in front of you, sir.

Q.   Okay.  Do you have accounts that you use that go by Danesh Norshirvan?

A.   The accounts that I have are all public.

Q.   Do they go by Danesh Norshirvan?

A.   They go by that Danesh guy.

Q.   That's good.  We're getting somewhere.  I have a couple of questions to just see that you're oriented to time, place and reality.  The first question is do you know what today's date is?

A.   Yeah.  We're -- it's September 10, I believe.

Q.   Okay.  Great.  And who is the current president of the United States?

A.   I don't see the relevance.  Donald Trump is the current president.

Q.   Okay.  Great.  And you do understand you are testifying under oath and expected to answer truthfully; right?

A.   Yes.

Q.   Okay.  And you're the defendant in this case; correct?

A.   Yes.

68

Q.   Okay.  And how old are you?

A.   I'm 38 years old.

Q.   Okay.  And you just said that you commonly go by the online handle @thatDaneshguy; right?

A.   Yes.

Q.   And under that handle, you have a large online following, over 2.5 million followers across all platforms; is that correct?

A.   Yes.

Q.   Okay.  Are you a mega influencer?

          MR. CHIAPPETTA:  Objection.  How is this relevant, Your Honor?

          THE COURT:  Yeah.  Now we're getting a little too far off field from what we need to talk about today.

          MR. LUTHMANN:  Okay.

          THE COURT:  This is a very limited purpose hearing.

          MR. LUTHMANN:  Okay.

Q.   Do you live in Mansfield, Pennsylvania?

A.   I do.

Q.   Okay.  And you admitted that in the sworn declaration you gave to the Court related to this matter; correct?

A.   Okay.

69

MR. CHIAPPETTA:  Objection.  Is there a question?

MR. LUTHMANN:  I said correct.  I answered with a question at the end.

THE COURT:  Well, it was duplicative, but all right.  Go ahead.

Q.   I'll restate it for the record.  In fact, you admitted in a sworn declaration that you reside in Mansfield, Pennsylvania; correct?

A.   Yes.

Q.   Okay.  Do you also reside in California?

A.   No.

Q.   Do you conduct business in California?

A.   No.

Q.   Okay.  You flew here today for the hearing; correct?

A.   Yes.

Q.   Where did you fly from?

A.   Pennsylvania.

Q.   Okay.  And in the past 30 days, have you been in the State of California?

A.   In the past 30 days, no.

Q.   Okay.  And so to be clear, you have children; correct?

A.   Yes.

70

Q.   I've seen them on social media; right?

A.   No.

Q.   So your children --

A.   You posted them once.  You posted a picture of my child once.  You posted a photo --

Q.   Your children are not --

THE COURT:  Whoa, whoa, whoa.  Hey. Question, pause, answer.

MR. LUTHMANN:  Okay.

THE COURT:  Okay.  So I think we have I don't know the fact whether he does or does not have children was really relevant.

MR. LUTHMANN:  It's going to get -- well, I'm going to get there for the California excursion when he was supposed to be in the Court.  It's relevant to this.

THE COURT:  Well, I don't think there's any dispute he was in California when he was supposed to be here.

MR. LUTHMANN:  Excuse me?

THE COURT:  There is no dispute he was in California when he was supposed to be here.

MR. LUTHMANN:  Okay, but I'm going to show the full pattern of the bad faith of his communications and to his three million users and his

71

disregard for this Court.  So just give me a little bit of leeway, Judge.  I'm going to stay in caveat with what you want.

Q.   So Mr. Norshirvan, you were notified on June 17 of the Rule 16 scheduling conference set for July 17 at 11 a.m.; that's correct?

A.   Yes.

Q.   Okay.  And you received that email notice?

A.   I don't recall receiving an email.

Q.   Okay.  So you don't acknowledge receiving the emails from the Court?

A.   I don't recall an email.

        MR. CHIAPPETTA:  Objection.  Well, I'll withdraw the objection.

        THE COURT:  Okay.  I think he answered already.

Q.   Okay.  And you admit in your affidavit you "mistakenly forgot to add the hearing to your calendar"; correct?

A.   Correct.

Q.   Okay.  And the hearing ended up conflicting with a family vacation; correct?

A.   Yes.

Q.   Okay.  And you claim that the vacation in the affidavit "had been planned well before this lawsuit

72

was filed"; is that right?

A.   Yes.

Q.   Okay.   But you actually purchased your airline tickets for that trip on May 2, 2025; didn't you?

A.   That's not relevant to when we had planned it.

Q.   The Judge figures out relevance.   Please answer the question.

A.   Excuse me?

Q.   The Judge figures out relevance --

A.   I answered your question, sir.

         MR. CHIAPPETTA:   Objection.   Argumentative.

         THE COURT:   All right.   That I will sustain. Okay.   We know when you bought the airline ticket.

         MR. LUTHMANN:   Was May 2, 2024.

         THE COURT:   Right, and I know when the case started was in April.

         MR. LUTHMANN:   The lawsuit was filed in late April.   Correct?

         THE COURT:   Okay.

         THE WITNESS:   We planned it back in January. My wife and I have been talking about it for a long time not that it's your business, sir.

Q.   But didn't you just submit evidence to the Court that the proof of purchase --

A.   Are you confused?

Q.    Excuse me.  Can I ask my question?

A.    Are you confused?  That's been answered, sir.

              THE COURT:  Let him finish his question. And then it's question, objection, answer.  So --

Q.    Didn't you just submit evidence to the Court today as well as evidence connected to your affidavit that you purchased on May 2, 2025 the airline tickets?

A.    I submitted evidence showing the email that this was planned far before June, but no, my wife and I had planned it, yeah, back in January or February.  We talked about it for a long time.

Q.    So booking flights on May 2 was not "well before you knew the lawsuit"; wasn't it?

A.    It was well before this hearing was scheduled.

Q.    So regardless, you never alerted the Court that you had a conflict on July 17; did you?

A.    Okay.

              THE COURT:  I'm sorry.  What was the answer?

              THE WITNESS:  I said okay.  Yes.

              THE COURT:  Right.

Q.    Okay.  You did not file any motion to reschedule or continue the July 17 conference; correct?

A.    Correct.  I should have.

Q.    Yeah.  And you didn't notify opposing counsel, me, or the Court at all before failing to show up;

74

right?

A.   Correct, sir.

Q.   Okay.  And on July 17, 2025, at 11 a.m. when you were supposed to be in Federal Court, you were not present either in person or remotely; that's correct?

A.   Correct.

Q.   Okay.  And in fact, the Magistrate Judge Mizell noticed your absence on the record and issued an order to show cause before you failed to appear; right?

A.   Please repeat that.  I didn't hear you clearly.

MR. CHIAPPETTA:  Objection.  Your Honor, can -- are you able to instruct Mr. Luthmann to slow down?  I can barely keep up with what he's saying.

MR. LUTHMANN:  Sorry.  I'll slow down.  I'll reask that.

THE COURT:  Thank you.

Q.   And in fact, Magistrate Judge Mizell noted your absence on the record and issued an order to show cause because you failed to appear; right?

A.   Yes.

Q.   Okay.

MR. LUTHMANN:  Your Honor, may I approach the witness?

THE COURT:  Yes.

MR. LUTHMANN:  Okay.  I can get this in

either as a judicial notice or as based on his testimony, but it is the Court's Rule 14 -- 16B Conference notes that were filed as Document 40 in the case.

THE COURT:  All right.

MR. LUTHMANN:  I would like that offered. I'll go through my basis.

THE COURT:  This is -- I am sorry, what document?

MR. LUTHMANN:  This is Document 40 in this case filed on 7/17/25, the Court's notes.

THE COURT:  Our minutes, yes.

MR. LUTHMANN:  Okay.

THE WITNESS:  Your Honor, I received a different thing in the mail.  It actually had different names on it.  I believe I gave it to you. This is another thing that led me to a lot of confusion.  I received something from the Court but it wasn't meant for me.  It was meant for another case. Can my attorney show you that?

THE COURT:  Well, let's -- you'll have a chance on rebuttal to ask you some follow up questions.

THE WITNESS:  Sure, sure.

THE COURT:  Unless he wants to ask you about

76

this for now.

THE WITNESS:  Sure, sure.

Q.   So looking at that document, these minutes were by the Clerk of the Court for the Middle District of Florida; correct?

A.   It looks like that's what this is, yes.

Q.   And according to these minutes, you did not appear at the Rule 16B Conference; correct?

A.   Correct.

Q.   Okay.

MR. LUTHMANN:  Your Honor, plaintiff moves this exhibit into evidence as a record showing defendant's non appearance on July 17.  It's a public record under 803BA, and it's self authenticating under 9021 based on this statement.

THE COURT:  Okay.  Well, I don't think I need to take it into evidence.

MR. CHIAPPETTA:  Your Honor, there's no objection.

THE COURT:  It's already on our docket.  It's our minutes.

MR. LUTHMANN:  All right.

THE COURT:  There's also no dispute he wasn't here.

Q.   Now, Mr. Norshirvan, isn't it true that on the

77

very date, July 17, 2025, you were actually at Universal Studios Hollywood in Los Angeles enjoying a theme park?

A.   I don't know exactly what date we went to Universal Studios.  It's disturbing that you have that knowledge of when I went there with my children.

THE COURT:  Just answer the question.

THE WITNESS:  I'm sorry.  At some point during this vacation, yes.  We went to Universal Studios.

Q.   Let me remind you we have video and photographic evidence of you queueing for the Mario Kart ride --

A.   I said yes.

Q.   -- at the exact hour you were supposed to be in the court.

A.   That's so --

Q.   Does that refresh your recollection, sir?

MR. CHIAPPETTA:  Objection.

A.   No.

MR. CHIAPPETTA:  Improper recollection -- improper attempt to refresh recollection without a document.

MR. LUTHMANN:  Okay.  Your Honor, may I approach the witness?

THE COURT:  All right.

78

THE WITNESS:  Sorry.  Mr. Luthmann, if I can answer your question?

THE COURT:  There's no question now.  He's rephrasing his question.

THE WITNESS:  Okay.  So this is inaccurate, sir.

THE COURT:  Hold on.

THE WITNESS:  Okay.  I apologize, Your Honor.

Q.   I'm handing the witness what has been marked as Plaintiff Exhibit 2.  Mr. Noshirvan, do you recognize the person in this image?

A.   That is King Koopa, and next to him, you'll see me.

Q.   Okay.

A.   Bowser sometimes he's referred to.

Q.   Okay.  And this is a screen shot of your own social media post; isn't it?

A.   It is.

Q.   And the post shows you at Universal Studios Hollywood; correct?

A.   Not on that date.

Q.   So what date was this?

A.   Because of you, I never post anything the same day.

79

MR. CHIAPPETTA:  Objection, asked and answered.

THE COURT:  I don't think we have an answer yet.

THE WITNESS:  I would never reveal that I'm at a theme park on the internet where you have access to where I am.  I posted this days after.  As I've said many times in the comment section of all these photos when people get concerned and say don't post your location, I say don't worry.  I would never post something the day of.  So no, I wasn't at Universal Studios the day of.

Q.   So thank you for your diatron.  It's a simple question.  Were you at Universal Studios in California on or about July 17, 2025?

MR. CHIAPPETTA:  Asked and answered.

THE COURT:  Well, pretty much, but okay. That's my understanding.  Mr. Norshirvan, do you want to say anything more about that?

THE WITNESS:  I mean, we made sure to do a lot of fun stuff with the kids if that's what you are trying to get at.  Yes.  We had a great time in Los Angeles.  Universal Studios is one of the things we did.

MR. LUTHMANN:  I'm going to ask the Court to

80

treat Mr. Norshirvan --

THE COURT:  Mr. Noshirvan, let's just answer the question point blank.  I mean, you can obviously be at Universal Studios for multiple days.  You have one picture from one day being there.  So on that day on July 17 you were supposed to be here, were you at Universal Studios?

THE WITNESS:  No.

THE COURT:  All right.

MR. LUTHMANN:  Well, I'm going to move this Exhibit 2 into evidence to establish his whereabouts on or about July 17, 2025, during the missed Rule 16B Conference in or around Universal Studios in California.

THE COURT:  All right.  We've covered a lot of ground.  Have we -- has he previously testified where he was that day?

MR. CHIAPPETTA:  He has not, Your Honor.

THE COURT:  Okay.  Why don't we just ask that question point blank?  Where was he when he was supposed to be here?

Q.   Where were you -- on the date at 11 a.m. on July 17, 2025, where were you, Mr. Norshirvan?

A.   My kids and I were at the swimming pool.

Q.   Excuse me?

81

A.    Swimming pool.  I took my kids to the swimming pool because it's warm in California.  We don't get a lot of that weather, so we made sure to go to the beach or the pool whenever we could.

Q.    Okay.  And where was the swimming pool located?

A.    That's -- I don't feel comfortable telling you.

MR. CHIAPPETTA:  Objection.  Relevance, Your Honor.

MR. LUTHMANN:  Is there a city or state that it was located in?  That's what I would like to know.

THE WITNESS:  Okay.  In -- I'm sorry, Your Honor.  I don't feel comfortable giving him locations.

THE COURT:  Well, it was a long time ago.

THE WITNESS:  But I -- because I could return to these locations, but I would like to say that it's in California if that's sufficient to you.

Q.    Is there a local in California?  California is very big state.  It's probably one of the largest in the --

MR. CHIAPPETTA:  Objection, relevance.

THE COURT:  I don't think we need to go any further.

MR. CHIAPPETTA:  Badgering.

THE COURT:  He's in California and he's swimming on the date and time he's supposed to be

82

here.

          MR. LUTHMANN:  All right.

Q.   So you won't give up -- give that information but I'm going to ask you about Snow the Product -- Snow That Product.  Who is Snow That Product?

A.   I'm sorry?

Q.   Snow That Product Podcast?

A.   Huh?  Oh.  Oh, you mean Snow the Product, yes. She's a rapper.

Q.   Okay.  How do you know that rapper?

A.   We follow each other online.

Q.   Okay.  And on or about July 17 when you were ordered to attend the conference, you actually sat down with her for a podcast in Los Angeles; is that correct?

A.   At some point I did a podcast with her while I was in Los Angeles, yes.

Q.   Okay.  And I'm going to show you two things in tandem Exhibits 3A and 3B.  This is 3A that has been marked.  And this is 3B that has been marked.

          Now, Mr. Norshirvan, please look at Exhibit 3A, and do you recognize the people in that photograph?

A.   It looks like myself and Snow.

Q.   Okay.  And where were you in that picture?

83

A.    At her studio.

Q.    And that's you seated next to her taping the podcast; is that correct?

A.    Yes.

Q.    And this was recorded on or about July 17?

A.    Possibly, I don't know.  Whatever the date says here.  July 15.

Q.    Okay.  And turning to Exhibit 3B is this a promotional image distributed publicly on social media to advertise that podcast appearance?

A.    Yes.

Q.    Okay.  And it features your name and likeness along Snow the Product?

A.    Uh-huh.

Q.    With the scheduled date and time of the podcast; correct?

A.    Yes.  July 15, 6 p.m.

Q.    Okay.  Exhibits 3A and B show you not only appeared on the podcast with Snow The Product but you also publicly promoted as a featured guest prior to that event?

A.    Please repeat your question.  I didn't hear you.

Q.    Exhibits 3A and 3B together show that you not only appeared on the podcast with Snow The Product, but you were also publicly promoted as a featured

84

guest tied to the event; correct?

A.   She publicly promoted me, yes.

Q.   And these events coincided with the exact period when you failed to appear in Federal Court as ordered; correct?

A.   No, not correct.

MR. CHIAPPETTA:  Objection.  Form -- excuse me, not form.  Objection misstates testimony, misstates facts.

THE COURT:  I'll -- I'm not confused by the question, so let's have the answer.

THE WITNESS:  No.  I was not scheduled to be in Court July 15 at 6 p.m.

Q.   Okay.  But you were in California at that point; correct?

A.   Yes.  I was in California when I should have been here.

Q.   Did you buy a plane ticket to come back to Fort Myers?

A.   Is this --

MR. CHIAPPETTA:  Objection.

THE WITNESS:  -- a real question?

Q.   It's a simple question.

A.   No.  I didn't -- I was very clear that I was there from the fifth to the fifth.

85

Q.   Okay.

MR. LUTHMANN:  Your Honor, I'd move Exhibits 3A and 3B into evidence as a consolidated packet relevant under 401.  They establish his activity and public appearances on or about the day he missed his mandatory Rule 16B Conference.  The authentication has been established through the defendant's own testimony under Rule 901.

MR. CHIAPPETTA:  Your Honor, objection. This is completely irrelevant to whether or not Mr. Norshirvan proved excusable neglect.  These documents lack predicate, foundation and they contain hearsay statements, and Mr. Luthmann has not met those as requirements in order to move these documents into evidence.

MR. LUTHMANN:  They are not offered for the truth of the matter asserted but rather to show the defendant's presence and conduct in and around the missed hearing, and they are therefore not hearsay, sir.  The circumstantial evidence of the location and activity including the fact that he was not on a vacation.

THE COURT:  I didn't hear a hearsay objection.

MR. CHIAPPETTA:  I did have a hearsay

86

objection.

THE COURT:  Okay.

MR. CHIAPPETTA:  But setting aside the hearsay objection, to the extent that after Mr. Luthmann's clarification, then Mr. Luthmann has now clarified they are absolutely irrelevant because there is no dispute that my client was in California on a family vacation whether he made an appearance or not, and again, this is two days before the actual hearing date.  So there's --

THE COURT:  I understand.

MR. CHIAPPETTA:  -- no relevance here.

THE COURT:  All right.  I think we do have at least some relevance.  We may be getting to the point of we're running afoul of being cumulative, but I'll take this.  I don't intend to belabor this much longer.

MR. LUTHMANN:  Okay.

THE COURT:  So we'll accept these.

(The following exhibit was received into evidence: EXH Number 3A and 3B)

Q.   So Mr. Norshirvan, you had time to participate in a podcast and go on rides at Universal all during the period you forgot the Court hearing was scheduled; correct?

87

A.   I don't understand the question at all.

Q.   I'll repeat it.  So you had time to participate in a podcast and go on rides, the Super Mario Bowser ride at Universal all during the period you forgot a Court hearing was scheduled; is that correct?

A.   I didn't do those things when I was supposed to be here, but I did while I was in California do fun things with my children.  I already admitted that. The whole point was a summer vacation.  The intention was fun.

Q.   Okay.  Let's go on that point.  You did not realize that you had missed the hearing until after the fact, and according to you, you say you found out by saying people talking about it on social media; correct?

A.   No.  I said it could be from that, but I don't actually recall.  In fact, it's more likely that it was when I got back that I had learned about it, but again, I don't recall.  I'm not at all saying as soon as it ended someone on social media told me.  I don't get information like that.

Q.   So you are retracting the testimony in your sworn affidavit?

A.   I don't know what you're talking about.  I said -- what I said was that it could be that someone

online had said something as you had said before because you said that earlier, but I wasn't verifying anything or authenticating anything as any fact.

Q.   Then let's go back --

A.   Well, I'm telling you right now.

THE COURT:  Hold on.  There's not a question.

THE WITNESS:  I'm sorry, Your Honor.

MR. LUTHMANN:  Give me a moment.

THE COURT:  I am not so sure it was a sworn affidavit, but I think you are referring to Document 49, his show cause response?

MR. LUTHMANN:  Document 49, yes.

THE COURT:  Okay.

MR. LUTHMANN:  Where are we?

Q.   You say in this in the second paragraph, and I'll read it.  On June 17, 2025, I received an email notice about a Rule 16 scheduling conference set for July 17, 2025.  While I did receive the notice, I mistakenly forgot to add the hearing to my calendar.  If I had, I would have seen it conflicted with a family vacation, family vacation that had been planned well before this lawsuit was filed.  I did not realize I had missed the hearing until I saw people on social media talking about it.  As soon as I saw that, I began working on

89

this response to explain what happened.

A. Okay.

Q. Is that -- do you recall making that statement?

A. Fair enough, yes.

Q. Is that statement true?

A. Yea.

Q. Is it true now or is it true when you wrote this?

A. Yes. Absolutely, yes.

Q. So what happened?

A. What you just read happened, sir.

Q. So what you said before, you were lying when you said that before?

MR. CHIAPPETTA: Objection. Vague, ambiguous, misstates facts.

THE COURT: I think he's --

MR. LUTHMANN: Okay.

THE COURT: I think he's clarified.

MR. LUTHMANN: Okay, thank you. You've clarified. Okay.

THE WITNESS: I apologize for that misunderstanding.

MR. LUTHMANN: Okay.

Q. Okay. And so who did you see talking about it online? Was it Mr. Luthmann, myself's posts that alerted you?

90

A.    God no.  No. Excuse me.  I meant to say no, not that.  I don't recall exactly what it was.  My priority would have been to respond to the Court at that point, not to figure out who reminded me.

Q.    But again, you say you don't recall, but in your affidavit you said you saw people on social media talking about it?

A.    Correct.

Q.    Who were those people?

THE COURT:  Just for clarity, I don't think this is an affidavit.

MR. LUTHMANN:  Well, in your submission. Sorry.

THE COURT:  The show cause response, yes. Okay.

MR. CHIAPPETTA:  Okay.  I'm going to object to that last question entirely.

THE COURT:  What, we're still asking about whether or not he recalls the social media post that reminded him of not being here.

MR. CHIAPPETTA:  I mean, this is a distinct without a difference.  You know, what Mr. Norshirvan had said in a previous statement to the Court versus not being able to recall at today's present date are apples and oranges.

91

THE COURT:  Mr. Luthmann, what are we getting at here?

MR. LUTHMANN:  I'll move along.

THE COURT:  Okay.  That's fine.

MR. LUTHMANN:  I think the point is clear that there's some ambiguity today with respect to the submission.  Submission seems a little more ironclad than his testimony.  Okay.

Q.   So as soon as you realized you missed the Federal Court hearing, you did not immediately call the Court or try to remedy it at that date; did you?

A.   I did.

Q.   Well, what --

A.   You're wrong.

Q.   Okay.  So instead of promptly notifying the judge or opposing counsel on July 17 or 18, you waited and prepared a written explanation; is that right?

A.   So the first thing I did was called the Court. That's the first thing I did.  I immediately called the Court.  I remember that now, and they told me this is not how you do it.  I'm not supposed to just call the Court.  I'm supposed to answer and respond, and so that's why I prepared a response, yes.

Q.   So in fact, you filed your response to the show cause order on July 29, 2025, nearly 12 days after you

92

missed the hearing; is that correct?

MR. CHIAPPETTA:  Objection, Your Honor.  I believe the show cause order provided a timeframe for Mr. Norshirvan to respond and try -- Mr. Luthmann is trying to use that timeframe against him here in this question.

THE COURT:  All right.  That's overruled.  I mean, he could have submitted it before we even got it, so you can ask that question about when he sent it to us.

Q.   Okay.  So Mr. Norshirvan, during those 12 days, you were still on your west coast trip; weren't you?

A.   Yes, I was.

Q.   And you continued to vacation after July 17; correct?

A.   Of course.  Why wouldn't I?

Q.   And you said before that you received the notice when you got back home in the mail?

A.   I did receive the notice when I got back home. When I went to the mailbox, they gave me all my missed mail.  Yeah, I did get it then too.

Q.   Okay.  So you didn't receive -- that notice that you received in the mail wasn't the only notice you received?

A.   No.  As I've been answering you directly, I told

you as soon as I found out from, you know, whatever that source, whoever it was online who said it, I don't even recall who said it, but as soon as I found out, I immediately called the Court, but there was nothing I could do when I called to the Court. So I had to respond simply, and yeah, I took time to make sure that my response was good, sufficient, and I did everything right because clearly I don't have knowledge of all of this legal stuff as well as you do, sir.

Q.   So you went to Las Vegas after California; correct?

A.   Again, while I was in California, I did a lot of fun. So fun was the point of the trip.

Q.   And so after California, you went to Las Vegas; correct, Mr. Noshirvan?

A.   This was part of the trip. No. I didn't have a separate trip. It was part of the trip. We went to Las Vegas too.

Q.   It's a very simple question.

A.   I answered it.

         THE COURT:  Whoa, whoa.

Q.   After California, you went to Las Vegas; correct? Yes or no?

         THE COURT:  Whoa, whoa.  You can't talk over

94

each other.  So again, just slow it down, and again, we've got microphones in here so you don't need to elevate your voice either.  Let's just keep it at an even pace and even tone.

MR. LUTHMANN:  Okay.

THE COURT:  All right.  So what was the question?

Q.   I said you went onto Las Vegas after California; correct?

A.   No, during.

Q.   Walk me through that.  How can you --

A.   So after happens when something ends.  During happens in the middle of something.

Q.   During your vacation --

A.   During the vacation we went to Vegas, yes, and then we came back to California.  So we were on a trip.

Q.   Okay. Hold on, hold on.  Hold on, hold on.

A.   Excuse me.  I'm answering you.

Q.   Okay, please.

A.   We were on a trip and we did fun things.  That included stuff like Universal Studios.  It included a couple of things you don't know about that were very fun.  The point is I did not know about the hearing and I apologize for missing it and I will not be

making those mistakes moving forward.

Q.   That's not what we are asking.  I'm just trying to get a timeline of you said you went to California and then you went to Las Vegas and then you went back to California; is that what the timeline we're talking about is?

A.   Do you need all of the details of my family trip because I --

Q.   I just want the general details of it, sir.

A.   Sir, I'm answering you.  I'm answering you. Because when --

Q.   You're obfuscating, sir.

THE COURT:  Whoa, whoa.  Again, you're doing it again.  All right.  So the question is, yes, can you give a rough outline of went to California, went to Nevada, went back to California?

THE WITNESS:  Went to California.  At some point during that, we went to Universal Studios, and at some point during that, we went to Vegas for a weekend, and I don't recall exactly which weekend it was but it was one of the four weekends.  We went to the beach.  We went to the pool.  We went to the botanical garden.  We -- I mean, if you want me to list it all out, we went to different restaurants that we enjoyed.

96

THE COURT:  Okay.  So there you go.

THE WITNESS:  Went to the Santa Monica Pier also.

THE COURT:  During his month long trip in California, he spent a weekend in Las Vegas.  All right.

Q.    And when you were in Vegas, you stayed at the Elara Hilton Grand Vacations Club; correct?

A.    Why do you have this information?

MR. CHIAPPETTA:  Objection.  How is any of this relevant, Your Honor?

THE COURT:  I can see the relevance for a bit.  Let's answer the question and see where this goes.

A.    Yes.  The only reason we went was because a friend of ours and a group of friends who were going that we haven't seen in years had a free place for us to stay, and so we stayed with them because it was -- it didn't cost us anything.

Q.    And you were filming social media content at that hotel around the pool?

A.    I don't recall doing such a thing.  You mean making my videos?  No.  If I went -- if I made a story, like I left a story on something or used social media in any average way, possibly, but no.  I wasn't

doing my job.  I don't remember doing anything like that.

Q.   So it's your testimony you didn't film any social media content at that hotel?

A.   So I'm sorry.  The testimony I just gave you?

Q.   Yeah.

A.   I just said I don't recall.

Q.   Okay.  So do you recall if you filmed around the pool?

A.   I -- no, I don't recall if I did.

Q.   Did you go to the pool?

A.   Likely.

Q.   Okay.  Are you a member of the Hilton Grand Vacations Club?

A.   No.

Q.   Okay.  Is anyone in your family a member of the Hilton Grand Vacations Club?

A.   I don't know why you need to know that.

Q.   I'm asking.

A.   Possibly.  I don't recall.

Q.   Okay.

         MR. LUTHMANN:  Your Honor, may I approach? I'm showing --

         THE COURT:  Okay.

         MR. LUTHMANN:  -- Mr. Norshirvan a group

98

of -- this is Exhibit 4A.

THE WITNESS:  This is why I have him blocked by the way.  This is --

MR. LUTHMANN:  This is Exhibit 4B.  This is exhibit 4C.  And this is exhibit 4D.

THE COURT:  All right.  So just so I am following you, you have 4A, B, C, D?

MR. LUTHMANN:  I have 4A, B, C, D.

THE COURT:  Okay.

Q.   And I'm showing the witness a group of exhibits that have been premarked for those purposes, 4A through D.  Now, Mr. Norshirvan, please look at Exhibit 4A.  Do you recognize that building depicted?

A.   So there's a PH on it.  It looks like Planet Hollywood.

Q.   Is that the Hilton Grand Vacations Elara Hotel in Las Vegas?  I'm looking at this, the A I handed you.

A.   I'm sorry.  Are you talking about this image?  I'm sorry.  My mistake.

Q.   This one is A, this one is B and that's C and that's D.

A.   Okay.  This seems to be the Hilton Grand Vacation.

Q.   That's the Elara Hotel.

A.   Okay.

99

Q.    And you stayed there?

A.    Yeah.

Q.    Okay.  And then Exhibit B, that's the pool area?

MR. CHIAPPETTA:  Objection.

Q.    Is that the pool area of the Elara hotel?

A.    Possibly.  I didn't memorize it.  I was there for a weekend.

THE COURT:  Hold on.  Mr. Chiappetta has an objection.

MR. CHIAPPETTA:  Well, there were two questions wrapped in there or a statement and then a question wrapped into whatever was just asked.

THE COURT:  I think the question was and that's the pool area of the hotel is what I picked up on.

MR. LUTHMANN:  Correct.  Is that the pool area of the hotel; correct?

THE WITNESS:  I would be speculating but I think that may be what it was.  I don't remember exactly.

Q.    You spent time at the pool during your trip?

A.    I spent a short time there, yeah.

Q.    Okay.  And Exhibit C is another image of the same Elara pool from a wider angle showing the deck and the signage.  Does that refresh your recollection?

100

A.   Not really, but I mean, if it's what you say it is, I'll take your word for it.  I didn't take these pictures.

Q.   And finally, Exhibit 4D is a screen shot showing you filming live content at the pool.  That's you in the image; is that correct?

A.   That could be anywhere.  That could be anything. What makes you -- what makes you determine this is me doing a live at the Elara pool?

Q.   Take 4B and 4D and put them together and look at the backdrop of the building.  Do those look the same?

A.   This is not enough to go from.  How could you say what date and time this?  I can't --

Q.   I'm trying to show you the proximity at the -- you've admitted that you've been at the Elara hotel; correct?

A.   I admitted it at some point, yeah.

Q.   And you admitted you were at the pool?

A.   I admitted I was at the pool, yes.

Q.   And you said that you were filming at the pool?

A.   I said I may have.

Q.   Okay.  Well, I'm showing you your filming, a screen shot, and the building behind it in your shot and then I'm showing you 4D which appears to be the same building.  Do you agree?

101

A.   I see a dead palm tree leaf on the left and on the right a like unidentifiable shape like a building, but no.  I can't agree with you on anything about this.  I'm wearing a T-shirt.  People don't wear T-shirts to the pool.  This is --- I can't confirm this, no.

Q.   So you are saying that you don't keep track of the social media you produce?

MR. CHIAPPETTA:  Objection.  Misstates facts.

THE COURT:  Well, yeah.  I'll sustain that, and I really don't see -- I think we passed the point of admission of returns.

MR. LUTHMANN:  Okay.  Gotcha.

THE COURT:  All right.

MR. LUTHMANN:  I'll go to the next one.

Q.   These Exhibits A through D correctly show your presence at the Hilton Elara pool and facilities in Las Vegas in mid July 2025 immediately following that you failed to appear for the Rule 16 Conference in Fort Myers; correct, Mr. Noshirvan?

A.   No.  I didn't take --

MR. CHIAPPETTA:  Objection.

THE COURT:  All right.

MR. CHIAPPETTA:  I'm going to need Mr.

102

Luthmann to show down and repeat that.  I did not catch his question.

THE COURT:  Okay.

Q.   Question, these Exhibits 4A through 4D collectively show your presence at the Hilton Elara hotel and its pool facilities in Las Vegas in mid July 2025 immediately following the date you failed to appear for the Rule 16B Conference in Fort Myers; correct?

MR. CHIAPPETTA:  Objection.  Misstates facts.  The witness has already testified he does not recognize those photographs.

THE COURT:  Well, 4D, yes, but let's see what Mr. Norshirvan has to say about that.

THE WITNESS:  Yeah.  So these three photos I did not take.  I don't know -- I understand these are photos of this hotel that I confirmed I was at.  I did not make any videos about my content in this hotel or at the pool.  What you are showing here is a live, but again, this could be anything and anywhere, and assuming you are correct, even assuming you are correct, that's not my content.

I don't do -- lives are just a little hello to people.  That's not -- that's not what my content is.  So no.  To answer your question accurately, no.

103

I wasn't making content by the pool or in Vegas.  I admit that I was on vacation in Vegas during the month that at some point I was supposed to be here, and I miscalendared that, and I apologize.

Q.   So you would admit that if a video were to be produced of you doing a live at the Elara pool, then your previous statements about it would not be entirely correct?

MR. CHIAPPETTA:  Objection.  Calls for speculation.  If a video would be produced, then this would be that.

MR. LUTHMANN:  Strike that.  I have a video of you at the pool.  When I produce that, can I call you a liar?

MR. CHIAPPETTA:  Objection.

THE COURT:  Okay.  All right.  I'll sustain the objection.  We'll see if we have to deal with the video later, but I don't think we're going to.

MR. LUTHMANN:  All right.  Your Honor, I move Exhibits 4A through D into evidence as a consolidated packet.  Again, they are relevant under Rule 401.  They establish the defendant's whereabouts and conduct during the time of his missed Federal Court appearance.  They are properly authenticated through the witness' testimony under Rule 901.

104

Exhibit 4D further shows defendant actively creating and broadcasting live content from the Elara pool.

MR. CHIAPPETTA: Lack of authentication, foundation.

THE COURT: Okay. As to all four? I mean, do we have a differentiation between A, B, C versus D? I mean, it seems like D was quite different from A, B and C.

MR. LUTHMANN: I would say --

THE COURT: I'm asking Mr. Chiappetta the nature of the objection.

MR. CHIAPPETTA: Well, I don't believe that that -- I would argue that it lacks relevance. It does not establish a timeframe. It's just literally a photograph of my client's face. It does not -- it lacks relevance essentially.

THE COURT: Okay.

MR. CHIAPPETTA: As it relates to D.

THE COURT: As to D, all right. And then did you have any problem with A, B and C?

MR. CHIAPPETTA: Yes. Authentication, foundation. My client said he didn't take those photographs. He took those photographs at face value for what Mr. Luthmann represented them to be. Setting that aside, I think Mr. Luthmann has failed to lay

105

down that proper authentication and predicate to admit those photographs into evidence as it stands here today.

THE COURT: Okay.

MR. CHIAPPETTA: That's not my client's testimony.

MR. LUTHMANN: They're demonstrative, exhibits circumstantial evidence of locations and conduct and admitted by the client that he was there in other testimony verifying other testimony, corroborating other testimony and validly admissible as evidence.

THE COURT: All right. I'm not going to accept D for now. As far as A, B and C, if they were demonstrative, they wouldn't be admitted into evidence, and but again, my recollection is Mr. Norshirvan said that they matched his recollection of being at the hotel. So they just depict where he was.

MR. LUTHMANN: Gotcha.

THE COURT: I don't see any problem with that. So for that purpose, we'll take A, B and C.

MR. LUTHMANN: You'll take A, B and C?

(The following exhibit was received into evidence: EXH Number 4A-D)

THE COURT: All right. So just in the

106

interest of time, Mr. Luthmann, what other areas of inquiry do you have left?

MR. LUTHMANN:  I'll try to get done.  I'm going to -- I'm scraping -- the other stuff that was outside the purview before, I'm scrapping that.  I'm going to get through some other questions here.

THE COURT:  Yeah.

MR. LUTHMANN:  About the time period, the vacation the 17th to the 17th and thereafter, that cushion.

THE COURT:  We are focussing on that.  So where are we going next?

MR. LUTHMANN:  Despite all this activity --

THE COURT:  No, no.  I'm asking what are your next intended inquiries about this?

MR. LUTHMANN:  I'm going to ask about the trip and who else was there on the trip.  Okay?  I'm going to ask about his relationships and motivations for being on the trip a couple things in that area, and I should be done pretty quickly.  Let me see.  I have -- I'm going to talk about the improv troop for a little bit.

THE COURT:  I'm sorry.  The what?

MR. LUTHMANN:  The improv troop that he was in Las Vegas for, and then talk about some other

107

things that show lack of mistake, lack of intent, lack of negligence, those type of things, and then I'll close.

THE COURT:  All right.  Well, I've heard plenty of testimony about all the family that went and there were.  I don't want to explore that anymore.

MR. LUTHMANN:  Okay.

THE COURT:  To the extent you would have any questions about any other commercial type meetings he might have been engaged in.

MR. LUTHMANN:  Yes.

THE COURT:  We can explore that a little bit more and then maybe this improv thing.

MR. LUTHMANN:  All right.  Let me move along.

THE COURT:  Yes, Mr. Chiappetta?

MR. CHIAPPETTA:  Your Honor, I apologize.  I just want to preemptively object because I can see Mr. Luthmann has an exhibit with my client's wife face on it.

THE COURT:  Yeah.  I just mentioned --

MR. CHIAPPETTA:  She's been harassed enough, and I'm just going to preemptively object.

MR. LUTHMANN:  No, no.  That's fine.  I'll scrap that.

108

THE COURT:  I said we're not going to explore the family anymore.  I've heard plenty of testimony about the family that went and the family that were there, but to the extent there were non family that might have been, you know, associated with Norshirvan's social media endeavors, I'll let you explore that.

MR. LUTHMANN:  Well --

THE COURT:  We've already done the podcast with the rap artist.

MR. LUTHMANN:  Yeah.  Well, I do have the fact that the wife and child are in the social media, but I'm going to put that to the side.

MR. CHIAPPETTA:  All right.

MR. LUTHMANN:  That's not where the Court wants to go, so I'll put that to the side.

MR. CHIAPPETTA:  One more objection, Your Honor.  Mr. Luthmann is going to attempt to introduce the Only Fans photograph that has been the subject of the 340 case and the 1218 case.  That is absolutely irrelevant here.

THE COURT:  I didn't hear anything about that.

MR. LUTHMANN:  He opened the door.  He talked all about the Only Fans and you accepted into

109

evidence all of my terrible things that he alleges about these -- about putting "stolen Only Fans."  I have every right to question him because he did it in direct and he's opened it and you've accepted evidence.

MR. CHIAPPETTA:  Your Honor, I would remind Mr. Luthmann that dissemination of this type of content is actually a felony in Florida, and he is not protected just because he's in this litigation from dissemination of those documents.

THE COURT:  Uh-huh.

MR. LUTHMANN:  I vehemently disagree because I've been to the Federal Bureau of Investigation with these documents.  They took the documents and they're investigating I believe as well as other people in the Federal Government.

THE COURT:  Okay.

MR. LUTHMANN:  I don't know how pornography --

THE COURT:  Let's take it one at a time.  Do you have any other -- you already asked about the podcast with the rap artist.  Do you have any other events like that you are going to explore?

MR. LUTHMANN:  Yeah, I have a couple.  He is an improv troop.  I'm going to bring that in and then

110

I'm going to ask just a couple questions about California. Let me just ask this one. It's a simple question.

Q. So you said you have family in California. How long has your family been in California?

A. All my life.

Q. Okay. And is your family originally from California or did they come from some place else?

A. This is why I have him blocked. My family immigrated here.

Q. Where did they come from?

A. They came from Iran.

Q. Oh, okay. And you said your mother lives here. Is she an American citizen?

A. Yes. She's an American citizen, Richard.

Q. Is she a naturalized American citizen?

A. Why do you care? Yes, she is.

Q. Okay. And you are an American citizen?

A. Yes. I was born here, Richard.

Q. Okay. Does your mother still hold any allegiance to the Islamic Republic of Iran?

A. This kind of racist stuff is why I have him blocked. And I shouldn't have to --

THE COURT: I don't have an objection. Mr. Chiappetta?

111

MR. CHIAPPETTA:  I'll object to it being argumentative.

THE COURT:  Yeah.  401 or 403, I don't see why we need to go down these lines.

MR. LUTHMANN:  I've made several --

THE COURT:  I'll sustain the objection.

MR. LUTHMANN:  Okay.  I'll stop that line.

THE COURT:  Okay.

Q.  So were you filming at the Elara pool for your content creation business?

A.  No.

MR. CHIAPPETTA:  Objection, asked and answered.

THE COURT:  That's sustained.  He's already answered plenty of questions about that.

Q.  And isn't it true some of the comment you film or have filmed is commercial pornography?

MR. CHIAPPETTA:  Objection.  Way outside the scope of this hearing, Your Honor.

MR. LUTHMANN:  I have a right to know what he's doing at the Elara where he was filming.  In that period I ask him, during the period relevant to this hearing, did you film any commercial pornography?

THE WITNESS:  No.

MR. CHIAPPETTA:  Objection, Your Honor.

112

MR. LUTHMANN:  Okay.  That's all I need.

THE COURT:  Okay.  All right.  We have a no. It didn't happen.  It didn't happen during this timeframe.

MR. LUTHMANN:  Okay.

Q.   And you said before you had an Only Fans page; that's correct?

THE COURT:  Given that answer, I don't see any need to explore that any further.

MR. LUTHMANN:  I'm going to say though does he still maintain the page?  I asked if he filmed.

THE COURT:  For what we're doing today --

MR. LUTHMANN:  Okay.

THE COURT:  -- I don't see any need to go down that road.

MR. LUTHMANN:  Okay.

Q.   What's the Mom's Basement Theater?

THE COURT:  I'm sorry.

Q.   What is the Mom's Basement Theater?

A.   It's a theater in Las Vegas.  It's kind of a hole in the wall small community -- not even community, smaller than that, just a hole in the wall theater, black box kind of theater.

Q.   What is Improv Shimprov?

A.   Improv Shimprov is a group that I used to do

113

improv with about 10 or 13 years ago.  How long has it been?  Not 10.  Since 2017 or 2016.  It's been quite a while since I've performed with them, but while I was in Vegas, they were -- my friends were there doing a show, and I did get to sit in on one after not doing it for like a very long time and it was a great, fun experience.

Q.   So you performed the improv?

A.   Yeah, I did.

Q.   Okay.  May I approach?

THE COURT:  Yeah.

Q.   I am going to show Mr. Norshirvan exhibits that I've premarked as Exhibits 7A through 7D and I will give Mr. Chiappetta copies as well.

THE WITNESS:  Again, photos of my wife. He's keeping track of every photo of my wife.

THE COURT:  All right.  So what collection is this again?

MR. LUTHMANN:  7A through D.  I'll say this again.  Showing the witness a group of exhibits that have been premarked for identification as Plaintiff's Exhibit 7A through 7D.

Q.   Mr. Norshirvan, could you please look at Exhibit 7A?  It's the first one I gave you.  That's the flyer.

A.   Yup.

114

Q.    Do you recognize that flyer?

A.    Nope.

Q.    Okay.

A.    I don't.  I had nothing to do with the creation or planning of anything on this.  They added me last minute because I was in Vegas.

Q.    Is that a flyer from Mom's Basement?

A.    I don't know.

Q.    Can you read?

        MR. CHIAPPETTA:  Objection.  Eliciting hearsay.

        THE COURT:  I'm sorry?

        MR. CHIAPPETTA:  It's eliciting hearsay. He's asking the witness to read the flyer.  That flyer --

        MR. LUTHMANN:  I asked if he could read.

        THE COURT:  Yes.  That was the question.

        MR. CHIAPPETTA:  It's also argumentative.

        THE COURT:  That's sustained.  Let's keep this above board.

Q.    Okay.  So you don't recognize the flyer at all?

A.    No.  I had nothing to do with this creation of or planning of.  I hopped in last minute.

Q.    Okay, but you recognize Improv Shimprov?

A.    Yes.  I told you I was part of this improv group.

115

Q.   Okay.

A.   In the past, but I haven't been for over eight years now.

Q.   So the second exhibit, Exhibit 7B, shows the inside of Mom's Basement Theater during a performance. Do you recognize that venue?  It's the larger picture with the panoramic view right there.

A.   It looks like it.

Q.   Okay.  So that's the inside of Mom's Basement?

A.   It looks like it is.

Q.   Okay.  And it's -- Exhibit 7C is a social media photo showing you on stage performing an Improv Shimprov show.  Is that correct?  Were you are on stage?

A.   This is another photo of my wife that you are keeping for some reason, but yes.  I didn't deny this, so I don't know why you need to keep those photos.

Q.   Wait a second.  The woman standing next to you, that's your wife?

A.   I don't recall.

Q.   Do you know who the woman standing next to you is?

A.   I can't authenticate this photo.  I don't know where you got it.

Q.   You just said a second ago that's another picture

116

of your wife.  I had no idea that that was your wife and you volunteered that information, so --

A.   If you are going to lie to the Court, that's fine.  Yes.  This is my wife.  That's my wife.

Q.   Okay.

A.   And you do know that.

Q.   No.  Now I know.

A.   You are lying to the Court.

THE COURT:  Again, again, don't talk over each other.  I need it -- again, the way this goes, question, pause, answer.

THE WITNESS:  I'm sorry, Your Honor.  It's the photos of my wife in his possession again is upsetting to me.

THE COURT:  Okay.  7C is Mr. Norshirvan on stage.

MR. LUTHMANN:  With his wife, yes.

THE COURT:  At the venue that you are talking about.

Q.   And then Exhibit D shows you and your wife Hannah dining with other members of the Improv Shimprov troop; correct?

A.   This looks like a photo of people getting dinner.  It does not look like a stage performance.  It looks like a bunch of people getting dinner.  And you can

117

keep my wife's name out of your mouth respectfully.

Q.   Okay, Mr. Smith, excuse me, but in that picture, are you in that picture?

A.   That's what it looks like but I can't authenticate these photos that you've provided.  I don't know.

Q.   But you say it looks like you?

A.   Yeah.

Q.   And the person next to you looks like your wife?

A.   Okay.  Is that a question?

Q.   Yes.  Does the person next to you look like your wife?

A.   You said the person next to you looks like your wife.

Q.   Yeah.  And the person next to you looks like your wife; is that correct?

A.   Yes.

Q.   Okay.  And do you recall that dinner?

A.   Not exactly, but I did have dinner with my friends while I was there, yeah.

Q.   In Las Vegas?

A.   Yes.

Q.   Okay.  So Exhibit 7A through D together show you were not only present at Mom's Basement Theater in Las Vegas but you were actively performing with the improv

118

troop and socializing with them afterwards; correct?

A.    I'm allowed to socialize with friends, yes.  I admitted to all of this.  None of this is --

Q.    Okay.  And these activities coincided the same period of time that you failed to appear at the Rule 16B Conference in Fort Myers; correct?

        MR. CHIAPPETTA:  Objection.  Misstates facts.  There's been no testimony that any of this occurred within the timeframe of July 17.

        THE COURT:  Okay.  Why don't we explore that first and sustain the objection.  Go ahead.

Q.    So on or about July 17, you were on your vacation?

A.    Around -- in that month, yeah, I was on my vacation.

Q.    You said before that pictures don't get onto to the internet or onto social media immediately, and so there's a lag or a difference in days; is that a correct characterization of what you said?

A.    When I post photos, I never post my -- I'll accurately tell you what I said.  I never post my exact location the day of because of people like you.  That's my honest answer.

Q.    Okay.

A.    And there's dates that show written here, and no,

119

it's not on the same date I was supposed to be here.

Q.    What was the date of the show?

A.    It looks -- right here it says Saturday, July 19 at 9:30 p.m.

THE COURT:  So just so the record is clear, it looks like the witness is pointing at 7A.

MR. LUTHMANN:  7A.

THE COURT:  Okay.  The flyer.

THE WITNESS:  Uh-huh.

THE COURT:  Okay.

Q.    And so how long before the July 19 event with Improv Shimprov was it -- did you find out about it? When did you first hear about this event?

A.    The comedy show?

Q.    Yeah.

A.    I believe it was the day before or a couple days before.  I was talking to my friends who happened to be going to Vegas, and they said do you want to jump in on a show, and I said I would love to.  I said I just got to warn you if we post about it online, you're going to get unfortunately people who are going to come harass you.  I was talking about you.  And they were very sweet.  They said, you know, we've been thinking about it.  We've seen the stuff you've been dealing with and we don't care.  You deserve to live

120

your life and we want to see our friend so I don't care, and that really moved me. So I --

Q. Mr. Norshirvan?

A. Excuse me. I'm answering you. Sir. Sir.

MR. CHIAPPETTA: Objection.

THE COURT: Mr. Noshirvan, I was waiting for Mr. Luthmann to ask about -- yeah. I think you've already answered the question.

Q. Yes. You've answered the question. Thank you. Okay.

THE COURT: Just so I'm clear, Mr. Noshirvan, so to the best of your recollection, the flyer matches the date that you were engaged with this troop on stage?

THE WITNESS: Yes. The flyer looks like -- the flyer looks like date is the date that I -- around the date that I was there.

THE COURT: Okay. All right. Very good.

MR. LUTHMANN: Your Honor, I move Exhibit 7A through 7D into evidence as a consolidated packet. They are relevant under 401 because they demonstrate this defendant's voluntary participation in entertainment and social activities during the very timeframe he failed to comply with the Federal Court order. Authentication has been established to the

121

defendant's own testimony under Rule 901.  These are not hearsay but circumstantial evidence of the defendant's whereabouts and conduct, corroborates his presence in Las Vegas and deliberate choice to engage in pleasure rather than to fulfill his Court's obligations.

THE COURT:  Uh-huh.

MR. CHIAPPETTA:  Your Honor, we don't object to the documents.  We do object to Mr. Luthmann's characterization because we believe they're clearly irrelevant being that this occurrence occurred on July 19 and the subject of this Court's order in this hearing is July 17.  So I would just like the record to reflect such.

THE COURT:  Okay.  Well, based on that, I would find they still remain relevant, close enough in time.  So we'll go ahead and receive them.

MR. LUTHMANN:  Okay.

(The following exhibit was received into evidence: EXH Number 7A-D)

Q.   So how long have you been doing improv?

A.   I have not been doing it for -- since 2016.

Q.   Okay.  When did you start doing improv?

A.   Way before this case, like 20 years ago.

Q.   Okay.  And it's a type of comedy; correct,

122

improv?

A.    It could be a type of comedy, yes.

Q.    So you are a comedian?

A.    No.  I'm a content creator.

Q.    But you do improv, and it's a type of comedy?

A.    When did I do it?

Q.    Is it fair to say you are a comedian?

A.    No.  When did I do that?  2016, so I'm not currently --

Q.    You said you did --

        MR. CHIAPPETTA:  Objection.

        THE COURT:  Wait.  You're doing it again.

        MR. LUTHMANN:  Okay.

        THE COURT:  Slow down.  And again, I'm questioning why we are doing this here.

        MR. LUTHMANN:  Okay.  I'll move along.

        THE COURT:  Okay.

Q.    So before earlier today, you were -- yes or no, you apologized to the Court for your failure to appear on the 17th; is that correct?

A.    I mean, I'm doing it right now as well, and I don't mind doing it again.

Q.    Okay.  But in that written response you filed with the Court on July 29, you offered explanations and justifications?

123

A.    Uh-huh.

Q.    But you didn't actually apologize anywhere; did you?

A.    I don't know.  I don't remember but I'm apologizing right now.

Q.    Okay.  So after you engaged counsel, Mr. Chiappetta, is the first time that you apologized?

A.    Okay.  I don't --

MR. CHIAPPETTA:  Objection to the extent that this response elicits privileged information.

THE WITNESS:  I believe, no.  Actually I apologized to the Court when I called in when I called that day because I remember calling the day.  I said I'm sorry, I didn't know, and they said this is the wrong way to do it.  But I am sorry.  I mean, I've made that clear.

THE COURT:  All right.  So I didn't see that that got afoul of privilege, so overruled for now.

Q.    I'm looking at your document, Mr. Norshirvan, number 49.  I don't see anywhere where it appears you apologized.  Do you recall apologizing in that Document 49 that you filed?

MR. CHIAPPETTA:  Asked and answered.

THE COURT:  All right.  Yeah, asked and answered, and again, interest of time.  I mean, the

124

document says what the document says.

MR. LUTHMANN: Okay.

Q. So you apologized today because you said you were wrong. When was the last time before today that you apologized?

MR. CHIAPPETTA: Objection. Asked and answered. If not, it's still answered.

MR. LUTHMANN: No, about anything. I'm asking about anything.

THE COURT: Um --

MR. CHIAPPETTA: Then vague and irrelevant.

THE COURT: Yeah. All right. Sustained.

Q. Okay. So let's talk about your social media activity around the time of our missed hearing. You are quite active online; aren't you?

A. If I'm not active, I don't make money. So yes.

Q. So while on this California and Las Vegas vacation, you were regularly using your phone and posting content; correct?

MR. CHIAPPETTA: Objection. Asked and answered.

THE COURT: Overruled. Let's see.

THE WITNESS: If you notice during that month instead of posting regular content I was posting a lot of photos and collages of photos because I

125

didn't have really the time on family vacation to make content, but I did try to make content whenever I possibly could. Otherwise I won't get paid. That's my job.

Q. So we established that on July 15 you co-hosted a podcast remotely and you also posted photos and videos from Universal Studios on July 17 to your followers; did you not?

A. To be clear, I did not co-host. I was a guest on somebody else's podcast. I did not make money from it. It's not my content. I don't own it. So I was a guest, and yes, I did take Universal Studios and took my kids to as you've described the Mario area.

Q. And you don't deny that you were documenting your trip on social media at least at times during that period?

A. I was documenting it, but I was also -- because as always I would take pictures during my family trip but I was also misleading you specifically so that you wouldn't harass us during this trip. So I would post things at the wrong times.

Q. So you had the presence of mind to engage with your online audience but not to check in on a scheduled Federal Court hearing; is that correct?

        MR. CHIAPPETTA: Objection. Argumentative.

126

THE COURT:  Sustained.

Q.    Later on when the people on the internet were talking about you skipping Court, you certainly saw those posts pretty quickly; didn't you?

A.    I don't recall.

Q.    You are very in tune to social media chatter about you so you saw that news and that's what prompted you to act by writing your response; correct?

A.    No.  I don't look what people are saying about me.  Every now and then when there's a development in the case, a couple suspicious profiles with no name and were created yesterday suddenly show up trying to taunt me or tease me or try to provoke me into saying something.  It's possible one of those accounts said something.

Q.    Okay.  So to be clear, it wasn't your conscience or proactive case management that alerted you.  It was a public embarrassment on social media that tipped you off; right?

MR. CHIAPPETTA:  Objection.  Misstates facts.  This is confusing and it misstates testimony. Mr. Norshirvan has previously testified that he was notified by some third-party on social media.  So how would conscience even be irrelevant or become even an issue here?

127

THE COURT:  Okay.  Yeah.  I'll sustain it because I think I've heard plenty about what apprised him of his -- at least his recollection about what apprised him about his failure to appear.

Q.   Okay.

THE COURT:  Okay.  Well, any other lines that you --

MR. LUTHMANN:  I'd like to get into his -- and ask just a couple of questions about why we should believe that it was an innocent mistake given his history with Judge Steele's findings in his order and his previous doxing of the Supreme Court Justices.  I want to get into that, but I think the Court wants -- I think the Court has enough?

THE COURT:  Yeah.  I think in the interest of time.

MR. LUTHMANN:  All right.

THE COURT:  I don't see -- I think 403 is going to prevent us from going down those roads.

MR. LUTHMANN:  I have nothing further on cross.

THE COURT:  All right.

MR. CHIAPPETTA:  Your Honor, if I may just a very brief close?

THE COURT:  Yeah.  Any redirect questioning?

128

MR. CHIAPPETTA:  Yes.  I do want to bring up one issue that was addressed if I may.

THE COURT:  Sure.

REDIRECT EXAMINATION BY MR. CHIAPPETTA:

Q.   All right.  Do you recall receiving this letter?  Or envelope, excuse me.

A.   Yes.

Q.   And what date is it post marked?

A.   June 18, 2025.

Q.   All right.  And are these documents the documents that were in that envelope?

A.   Yes.  Yes.  This is -- yes.

Q.   Okay.  And intermingled in there on the first page, what is the caption?

A.   On this page here?

Q.   Yes.

A.   I'm sorry.  What do you mean caption?

Q.   The parties names.

A.   Parties names say Lana Patrick plaintiff versus Mike Visano Tax Collector Pasco County Florida defendant.

Q.   And what is the case number?

A.   Case number is 3:25-CV-627/MMH/LLL.

Q.   Okay.

MR. LUTHMANN:  Can I see those?  Can I

129

examine and voir dire these?

MR. CHIAPPETTA:  Yes, of course you can because we are going to go to Page 2 where it actually addresses this case where they are commingled.

MR. LUTHMANN:  Lana Patrick.

Q.   So Mr. Noshirvan, you've previously testified that you received a show cause order for case number 3:25-CV-00627; is that correct?

A.   Yes.

Q.   And that's the Jacksonville division?

A.   That's what I received.

Q.   Okay.  And now there's a second page that was part of this envelope too; correct?

A.   Yes.

Q.   And are you able to explain what this document says?

A.   Yes.  This document -- this one looks relevant to the case and this one says text order Local Rule 3.03 requires that with first appearance each party must file a disclosure statement using standard form from the Clerk or the Court's website but defendant has failed to do so.  Furthermore, while plaintiff filed his disclosure forms, he used an incorrect form as such paper is deemed stricken and the Clerk is directed to delete the pdf file from the CMECF docket

130

by July 2.  Parties must file a disclosure statement using standard form filed here signed Judge Magistrate Judge Nicholas Mizell.  Did I say that correctly, Your Honor?

THE COURT:  It's Mizell.

THE WITNESS:  Mizell, I apologize.

THE COURT:  All right.

Q.   Okay.  And now the other two documents, what did they contain on them?

A.   So this is for somebody else, and this one had an order for Lana Patrick saying that order directing plaintiff to show cause by written response filed on or before July 2 why this case should remain pending in the Jacksonville division and not be transferred to Tampa division pursuant to Local Rule 1.04B.  See order details signed by Judge Marcia Morales Howard on 6/18.

Q.   Okay, and --

MR. LUTHMANN:  I'm going to object to all of this.  This is outside the scope of redirect.  He's offering new evidence at this point, and I would ask this entire line be stricken.

THE COURT:  No, I recall we had some Q and A on this before.  So we'll let him clean this up.

Q.   Okay, and what is the address on that document?

131

A.   It says here Richard Luthmann, 4199 Los Altos Court, Naples, Florida 34109.

MR. CHIAPPETTA:  Thank you.  And does this packet that I've just handed you that we've discussed here today reflect a true and accurate copy of the letter sent to you by the United States District Court of the Middle District of Florida.

THE WITNESS:  Yes.  That's exactly what I received.

Q.   Then at this time to show that an error did occur in mailing, we would like to move this -- these documents in as Defendant's Composite 3.

THE COURT:  Let me -- well, all right. Apparently this is an envelope that was received and addressed from the Court addressed to Mr. Norshirvan and was sent on June 18.  Yes?  These are all the contents of that envelope.

MR. CHIAPPETTA:  Yes.

MR. LUTHMANN:  I'm not going to object, but I do want to recross on this.

THE COURT:  Well, let me see them.

MR. CHIAPPETTA:  May I approach, Your Honor?

THE COURT:  Yeah.  We're going to take them in.  Let me see what we have here.

(There was a pause in the proceeding.)

132

THE COURT:  Mr. Luthmann, are you -- I'm trying to maybe clarify this for everybody.  Are you a party to this Patrick versus Visano matter?

MR. LUTHMANN:  No.  No, Your Honor.

THE COURT:  Okay.  I take it Mr. Norshirvan is not a party to that either?

THE WITNESS:  No.

THE COURT:  All right.

THE WITNESS:  Your Honor, no.

(There was a pause in the proceeding.)

THE COURT:  All right.  Well, it appears that what happened here is -- just for everyone's benefit about how things work around here, so this is an attempt by the Clerk to send Document 20, the text order that we docketed about the 303 disclosure form and to send it to Danesh which has his address here in Pennsylvania and looks like it may have also been an attempt to send that very same order to Mr. Luthmann.

But then we have obviously an order from the Jacksonville matter that's addressed to Ms. Patrick, and somehow this ended up in the same envelope, but the way the clerk's office works throughout the district, it's kind of a unified clerk's office.  So folks downstairs could be mailing things to parties and cases from Tampa, Orlando, Jacksonville, and vice

133

versa, folks out in Jacksonville or Tampa could be mailing you things in our case. So we've kind of got this unified distribution of labor in the clerk's office. So it appears that what was intended to go to Ms. Patrick happened to get into this envelope, but nevertheless, the order that we docketed 20 made its way to Mr. Norshirvan. All right.

MR. CHIAPPETTA: All right.

THE COURT: That's what we have here.

MR. CHIAPPETTA: Then I have no further questions.

THE COURT: Okay. And I don't think this related -- apparently this didn't relate to the Notice of Hearing. That's a separate event.

MR. CHIAPPETTA: Not necessarily the Notice of Hearing but the confusion that ensued after as it relates to the communication because obviously Mr. Norshirvan was pro se at the time and that would be confusing for someone who lacked experience.

THE COURT: About why this Ms. Patrick's order is in here?

MR. CHIAPPETTA: Exactly, Your Honor.

THE COURT: Okay. Well, again, you can always call the clerk's office and get some clarification on that, but you got a copy of document

134

which that's what the purpose of this mailing was. Okay.

MR. LUTHMANN:  I just have two recross questions.

THE COURT:  About?

MR. LUTHMANN:  About --

THE COURT:  Oh, did you have anything else about redirect wise?

MR. CHIAPPETTA:  No.

THE COURT:  All right.  What --

MR. LUTHMANN:  Recross is just about his actions after he received that to show the pattern of what he did.  Did he call the clerk, did he not call the clerk?

THE COURT:  I'll allow a question or two.

RECROSS EXAMINATION BY MR. LUTHMANN:

Q.   So Mr. Norshirvan, after you received this package, did you believe it was sent in error?

A.   Yes.  I believed it was sent in error.

Q.   Did you call anybody to inquire about it?

A.   No.  No, I did not.

Q.   So you didn't call the clerk?

A.   No.  I just assumed it was a mistake.

Q.   Did you talk to any attorneys about it?

A.   Nope.

135

Q.   Did you talk to Mr. Chiappetta?

MR. CHIAPPETTA:  Objection.  It would elicit attorney client privilege.

THE COURT:  Yeah, that would.

MR. CHIAPPETTA:  And/or work product.

THE COURT:  Okay.  We'll sustain that.

THE WITNESS:  I assumed it was a mistake.

THE COURT:  Well, there's no question.

THE WITNESS:  Oh, I'm sorry.

Q.   You didn't think it was that important?

MR. CHIAPPETTA:  Objection.  Misstates facts.

THE COURT:  Well.

Q.   Did you believe that it wasn't important enough to make a phone call about it?

A.   I now see that I should have, but at the time, I thought it might be a mistake.

Q.   Okay, that's fine.

A.   But everything to do with the Court is important.

THE COURT:  All right.  Okay.  Mr. Norshirvan, I think you are done.

THE WITNESS:  Thank you.

THE COURT:  You can step down.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Mr. Chiappetta, did you have

136

anybody else you wanted to call?

MR. CHIAPPETTA:  No, Your Honor.

THE COURT:  Okay.  And did you want to offer a couple quick points?  Or maybe we'll take a break for lunch and resume after.

MR. CHIAPPETTA:  I can --

THE COURT:  Or do you want to resume after lunch?

MR. CHIAPPETTA:  Is there any way we can just go through this quickly?  I can -- maybe ten minutes rather than take an hour break.

THE COURT:  Well, we don't need to take an hour but I do want to give everyone here a break, and so if you want to -- I remember you wanted to offer something in the way of closing type statements.  Do you want to make them now or after?

MR. CHIAPPETTA:  I can be very brief and I'll make them now if Your Honor will allow if Your Honor --

THE COURT:  Because either way we are going to resume.  We're going to resume after lunch and I want to get your final remarks about this issue and then maybe talk about typical Rule 16 issues and things like that.

MR. CHIAPPETTA:  Understood, Your Honor.  If

137

you would like, I can wait until after lunch.

THE COURT:  Yeah.  Maybe you have an idea to kind of -- you know, have an opportunity to kind of think about it.

MR. CHIAPPETTA:  Okay.

THE COURT:  All right.  Well, I'm going to take a break.  Well, hold on.  Before we do that, Mr. Luthmann, did you have anything?

MR. LUTHMANN:  I was just going to suggest --

THE COURT:  Did you want to offer anything into evidence before we take any kind of argument from you all?

MR. LUTHMANN:  Well, yeah.  I wanted to -- I thought I offered all that stuff into evidence.

THE COURT:  The things I've already received?

MR. LUTHMANN:  Yeah.

THE COURT:  Okay.  We've already done that, but outside of that, anything else to offer?

MR. LUTHMANN:  No.  I have nothing else to say.  I'm not calling any witnesses.  I'm going to rest on everything that's been done.

THE COURT:  Okay.  Then I'll offer -- I'll let you all offer some argument about the show cause

138

issue when we get back, and then we'll talk about typical Rule 16 type matters and hopefully send you on your way.

MR. CHIAPPETTA:  And Your Honor, if we can discuss the discovery issue as well.

THE COURT:  Yeah.  We can talk about all that stuff under the ruberic of Rule 16 and keeping things running smoothly.  Okay.  Why don't we get together say -- Wendy, do we have anything else this afternoon?

THE CLERK:  We have two new arrests at 2:30.

THE COURT:  All right.  We're going to try to be wrapped up before 2:30.  I've got some new arrests, and there's a variety of other things going on in the Courthouse as you can imagine.  We even have a high profile murder trial going on right down the hall.  So all sorts of things going on.  And okay. How about just go grab something quick, maybe get back here by 1:15.

MR. LUTHMANN:  Yes, sir.

THE COURT:  And then we'll maybe spend an hour together before I have to do my 2:30 events.

MR. LUTHMANN:  All right.

THE COURT:  There's plenty of things out there.  You've all been here before, and you are

139

probably familiar with the dining scene out there but there's plenty of places to get something very quick.

MR. CHIAPPETTA:  Yes, Your Honor.  Thank you.

THE COURT:  All right.  See you then.

THE WITNESS:  Thank you, Your Honor.

(The proceeding recessed at 12:25 p.m.)

(The proceeding reconvened at 1:20 p.m.; appearances as before noted.)

THE COURT:  Okay.  Welcome back.  Hope everybody got refreshed a little bit, grab a bite, grab a drink, that kind of thing.  While I was reflecting on everything we talked about so far, I did have one more question and I guess I'll allow the lawyers to follow up if they want, but it's Norshirvan?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Okay.  I'm trying to remember how to pronounce it correctly.

THE WITNESS:  I appreciate it.

THE COURT:  So obviously I did check the docket and just so we are all on the same page everything we've been sending to you has been through the postal mail.

THE WITNESS:  Okay.

140

THE COURT:  So all of our notices have been I call it snail mail.  S we have snail mailed to you paper copies of everything and never emailed you, and I think part of the confusion I think at some point you filed something with us that might have suggested that you might have missed the notice because again you weren't -- you had a lot of email issues and you had a lot of email issues with Mr. Luthmann and I remember thinking at that time, wait a minute, that's not a problem because we're not emailing you.  We're mailing you.

So anyway, I did check that.  Just like this, everything else has come to you this way.  So that's what the docket reflects, and but in addition to that, have you ever done any other ways of just checking the docket?  Do you ever use like Pacer or things like that to just check how the docket is looking and what's going on?

THE WITNESS:  I have, yes.  I have used it before.  Although it's difficult to navigate, I've tried to use it, yeah.

THE COURT:  Okay.  So have you used it while this case is pending since April?

THE WITNESS:  I don't believe I have.  I've used it on the 1218 case.

141

THE COURT:  Okay.

THE WITNESS:  Yeah.

THE COURT:  That's common.  I mean, you are involved in multiple cases and it's a good way to just keep tabs on things.

THE WITNESS:  Yeah.

THE COURT:  Okay.  And then all right.  Well, anyway, we clarified how we were sending everything and what the record reflects from our end, and then just wanted to make sure if you had any other means of kind of keeping yourself apprised.  Okay.  Do you want to give me any other kind of thoughts about the show cause issue and then we'll move on to some other things?

MR. CHIAPPETTA:  Brief closing, Your Honor.

THE COURT:  Sure.

MR. CHIAPPETTA:  May I approach?

THE COURT:  Please.

MR. CHIAPPETTA:  Your Honor, just very briefly, I just want to point out that Mr. Norshirvan does not contest that he received the letter essentially requiring him to appear for the -- in June for the July Rule 16 Conference.  That's not at issue here just to clarify that.  I do think that Mr. Norshirvan's testimony here today has unequivocally

established excusable neglect. I believe Mr. Luthmann himself had kind of expressly stated negligence which in and of itself is a form of neglect.

So when we look at that at the time Mr. Norshirvan was pro se, he should be -- we would request that he's afforded that leniency at this hearing here just simply because the events and acts that were occurring was when he was pro se, and we also would like to address the issue that there is zero record evidence of any willful intent of any kind whatsoever isolated as it relates to the July 17 conference.

It just -- there's just nothing on the record what -- via oral testimony or documents admitted into evidence. In fact, I think all of the evidence goes the other way, and so I would respectfully request that this Court not impose a sanction at all, but if this Court was inclined to impose a sanction, I would ask for a reduced sanction -- a reduced monetary sanction at most simply because of the circumstances here, and I would also posit that default is an extreme remedy, and based upon what the testimony here today supports, the causal factors have not been met. There is no willfulness. There's no chance of repetition because

143

Mr. Norshirvan is represented, and given that, we would just request some leniency from Your Honor.

THE COURT:  Very well.  All right.  Thank you.

MR. CHIAPPETTA:  Thank you very much.

THE COURT:  Mr. Luthmann, would you want to make a few remarks?

MR. LUTHMANN:  Default is not an extreme remedy.  Your Honor admitted default happens all the time in this Courthouse when people fail to do what they are supposed to do, and what are they supposed to do after they catch themselves, come to this Court and establish reasonable cause, good cause and good faith, a good faith reason why they messed up if they messed up.  But when they thumb their nose at the Court, that's a total different story, and I think we have here a pattern of an individual thumbing his nose at the Court, and I'll point to two things the Court should take a look at.

Take a look at the docket sheet and take a look at specifically Document 25.  That was Mr. Norshirvan's opposition or his motion to dismiss to the original complaint in this matter, and if we're going to take him at face value, then we should give him a chair at the Levin School of Law at the

144

University of Florida in Gainesville because he's a learned individual.  He's no Polly Anna.  Take him -- he signed this document.  Take him at face value.  The man could probably recite the civil procedure from Pennoyer v Neff and International Shoe and Berner versus Inferior Court onward if you read this document.  He wrote it by himself, all by himself.  He didn't say to anyone that he had any help.  He didn't say he had a ghost writer.  He didn't say anything else.  So let's take him at --

MR. CHIAPPETTA:  I'm going to object to this.

MR. LUTHMANN:  Let's take him at face value at what the Court record says.  Thank you, Your Honor.

MR. CHIAPPETTA:  Your Honor.

THE COURT:  Okay.

MR. CHIAPPETTA:  I object to Mr. Luthmann's entire closing as none of this was elicited in the actual testimony whatsoever, and it's completely outside of the scope of this proceeding and improper to close on something that was not even addressed for purposes of this hearing.

MR. LUTHMANN:  The record is always addressable, Your Honor.

THE COURT:  Yeah.  I mean, obviously the

145

motion is on file and it is what it is and it appears what it appears, but we certainly did not explore anything about how it was prepared and we're not going to now, but I understand the basis for Mr. Luthmann's suspicions, but we can leave it at that.

All right. Well, I think I have everything I need, and I'll again take it under advisement about what we are going to do on that, and I am somewhat mindful also about the point that the motion to dismiss that's pending does raise some jurisdictional issues I think both subject matter and personal, so we may want to see how those play out before I'm, you know, assessing a sanction and then having to maybe unwind a sanction for lack of jurisdiction. So I'm going to maybe keep that on the shelf for a bit.

Let's see. Couple other things. I saw references to a variety of motions that I think maybe have been drafted and exchanged with each other but not necessarily filed with us, and so hopefully you can continue to discuss and hopefully work it out amongst yourselves. I will -- on that score, let me say that I think there's a pending motion about the communication issues in the case. I think that was filed before Mr. Chiappetta joined us, and I think that really changes the landscape on that.

146

So I don't really think that motion -- I think basically it's moot now that we have counsel here, and then as far as communication goes, I did see the -- well, two notes.  I saw the email that I think Mr. Luthmann sent around around 2:30 something this morning.  Encourage you to maybe revisit your sleep hygiene on that, but --

MR. LUTHMANN:  I wanted to make sure everybody had everything they need.

THE COURT:  I understood.  I hear the same thing about mine.  So -- that email the 2:30 email that I saw, that is what emails between you all should look like.  All right?  That was business like.  It was to the point.  There was no name calling, hyperbole, invective, drama.  It was just, you know, very business like, and that is how these communications should be going back and forth.

So please keep it like that and don't -- don't swim any other waters, and also don't loop us in.  We don't want to be looped in on your emails back and forth.  I imagine a lot of these people don't want to be looped in.  I don't think Governor DeSantis or the Attorney General of Florida, they probably have a lot bigger fish to fry than what's going on in this case.

So I would keep it to you all and keep it business like, and let's just stay focussed on trying to keep this thing running along efficiently. I mean, Rule 1 of civil procedure, right, is it's all about efficiency, and everything we're supposed to do here is all about trying to get to a fair and efficient resolution. Inexpensive, efficient and fair. So we need to keep the other two in mind about being efficient and inexpensive. Okay. And then what was the other one that I think was still with us?

MR. LUTHMANN: Your Honor, if I may.

THE COURT: It's currently pending; right? I'm trying to --

MR. LUTHMANN: If I may, Your Honor.

THE COURT: I talked about 59. Just a second. I want to talk about what's pending with us. Amended motion to dismiss. That's not with me. That's with Judge Badalamenti. You probably -- not for long. I don't know if you all were watching the Senate last night, but we are about to have a new District Judge here. Judge Dudek just got confirmed, so he's probably going to be your District Judge here in the next day or two, any minute now really. Okay. And I know you are both familiar with Judge Dudek. So --

148

MR. CHIAPPETTA:  Yes, Your Honor.

THE COURT:  He's going to get one or both the other cases and he's familiar with you.  All right.  And then -- yeah.  Again, let's try to avoid -- we really need to focus on the issue here of, you know, stay focussed on the merits of the case.  I would encourage you all to not to go down other roads of -- a lot of folks can get these things all wrapped up in other angles.  You want to be mindful about, you know, I can remember back when I was in the trenches.  I would never threaten anybody with anything criminal.  I would never threaten anybody with anything about disciplinary proceedings or anything like that because it's not helpful, and it's much better to just stay focussed on the merits of the case.

I guess Rule 16 wise since the defense wasn't here before, I mean, we already put a schedule in place and I looked at it this morning.  It looks like discovery doesn't even close until I think May or June of next year; is that right?  So I think -- does that still remain plenty of time for you all?

MR. CHIAPPETTA:  Yes.  I believe that the current schedule as written is more than enough time.  The only thing that we would request is an ESI protocol which we did provide in our written discovery

149

to Mr. Luthmann because this case is all ESI, Your Honor.

THE COURT:  Sure.  Okay.

MR. LUTHMANN:  Yeah.

THE COURT:  Try to --

MR. LUTHMANN:  I have no problem with that. I'm all about it.  I put it in mine too.

THE COURT:  Okay.

MR. LUTHMANN:  The one point of housekeeping I had was that after the Rule 16 that we had we talked about mediation.

THE COURT:  Yes.  Do you have to agree to one still?

MR. LUTHMANN:  And he hasn't like talked to me about that.  I put it on the docket.  I'm good with Mr. Burkett.  I know that Mr. Burkett has a history of being a very good mediator here.  I'll take him.  I know he's worked with Mr. Chiappetta before, and I would even say that mediation might help this case sooner rather than later.

THE COURT:  Yeah.

MR. LUTHMANN:  If we put everybody down in a room, I think I can resolve this.  I'm not looking for a lot here.  I'm just -- this is more --

THE COURT:  Mr. Luthmann, just sit up in

150

your chair.  I can hear you better.

MR. LUTHMANN:  This is not something that I'm not looking for a lot.

THE COURT:  Okay.

MR. LUTHMANN:  You know, that's just it.

THE COURT:  You've worked with Mr. Burkett before, but he sounds -- this matter seems a bit too simple for someone like that.  Mr. Burkett handles very complex matters.  We're talking a lot of arcane theorys and multiple defendants and millions or billions of dollars at stake.  That's the kind of thing he usually handles.

MR. CHIAPPETTA:  Yeah.  Mr. Burkett mediated the 340 case and the 1218 case.

THE COURT:  Oh, okay.  So he's already familiar with at least this side.

MR. CHIAPPETTA:  Yes.

THE COURT:  Okay.  Wow, interesting.

MR. CHIAPPETTA:  But given this case not necessarily at least in its current posture being his --

THE COURT:  What's his rate?

MR. CHIAPPETTA:  He's expensive, and until counterclaims come in and more parties come in, he may be above this case's pay grade.

151

THE COURT:  That's what I'm thinking.  I mean, isn't -- I wouldn't be surprised if he didn't charge 6 or $700 an hour or something like that.

MR. CHIAPPETTA:  $750.

THE COURT:  $750 an hour, you might not want to foot that bill, Mr. Luthmann.

MR. LUTHMANN:  Well, no.  I think three, four, five hours with a guy like that, we know if this thing can get resolved or not.

THE COURT:  Okay.

MR. LUTHMANN:  That's the way I look at it. I'm a big believer that you try to sit down and talk early.  You know, if you don't talk early, if you don't ask, you're not going to get it.  So you might as well ask.  You might as well put somebody in the middle that is the best at doing this.  So that's how I feel.

THE COURT:  You're preaching to the choir on that one.  The Court always encourages you all to always talk about resolution while this is pending. We can walk and chew gum, right?  We can litigate and try to resolve all at the same time.  We can have two lines of communication going on.  I know they're opposite in ways.  They kind of cut against the grain of each other.  Right?  Having this zealous litigation

152

against each other, but also trying to resolve it on the other side, but you've got to do both at the same time, and, you know, we do encourage you to do that, and yes, I always tell folks you can mediate as often as you like.

You can mediate more than once.  You can mediate early.  If it doesn't work, you can mediate later.  If you need more litigation therapy before you can resolve, that's your prerogative.  So yeah.  So we always encourage that, but apparently you have not agreed to one, but how about we set a deadline for you to at least agree to one?  Maybe two weeks from today.

MR. LUTHMANN:  I feel I put it out there. If he wants to come back with some other changes and other people.

THE COURT:  Yeah, okay.  Mr. Chiappetta can give you some names.

MR. LUTHMANN:  I've been putting out the offer, so I feel I should get one back.

THE COURT:  Yup.  That's fine.

MR. LUTHMANN:  Or a counter offer.

THE COURT:  Give you a couple weeks to work it out.

MR. CHIAPPETTA:  Your Honor, when is the deadline for mediation to occur?

153

THE COURT:  Well, regardless, we always want at least the identity of the mediator upfront.

MR. CHIAPPETTA:  I'm trying to determine based on the deadline date if whether or not I can agree to Mr. Burkett here today based on potential counterclaims coming in.

THE COURT:  Well, your mediation deadline is -- let me get it in front of me.

MR. LUTHMANN:  You gave us four weeks from the July 17 date.  So the mediation deadline has passed from that order.

THE COURT:  Hold on.

THE CLERK:  7/10.

THE COURT:  July 10 is your mediation deadline.

THE CLERK:  2026.

MR. CHIAPPETTA:  Of '26?

THE COURT:  Yeah.

MR. CHIAPPETTA:  Oh, yeah.  Then we can agree to Mr. Burkett.

THE COURT:  Okay.

MR. CHIAPPETTA:  Mediation will occur before July of '26.

MR. LUTHMANN:  I like that.

THE COURT:  Okay.  So yeah.  There you go,

154

making progress.  You've got a mediator agreed to.  Of course, you've got plenty of time to revisit that too.  So for now, we'll expect mediation with Burkett.  If that changes and you choose to mediate with someone else, just file a joint notice that you've changed the mediator.  Again, something I always say at Rule 16 Conferences, we -- and I think you know we have a certified list of mediators here on our website.  We prefer you use those individuals, but if someone who is not on our list is well suited to get the job done, we're certainly not going to balk at that.  So you can use somebody off our list.  Just explain why you are departing from the list and you'll be good to go file the joint notice.

MR. CHIAPPETTA:  Thank you, Your Honor.

THE COURT:  Okay.  So that's good that's done.  So schedule mediation, and again, I just want to -- I think everybody is going to be well served if you try not to get bogged down in collateral issues.  I know Mr. Luthmann has made some references before about potentially trying to disqualify Mr. Chiappetta.

Again, I think you are all well served if you just -- unless you absolutely cannot put that aside, but if you can find your way of putting it aside, maybe it's just better to stay focussed on the

155

merits.  So I just put that out there.

MR. LUTHMANN:  Your Honor, I hear you, and you set the goose gander rule last time and I'll bring it up again.  I will tone down my rhetoric if they tone down theirs.  I was just told that I was committing crimes in the State of Florida, you know, and I've gone to law enforcement.  Believe me I've gone to law enforcement.  So we don't need it either way.  You know, and frankly, I will be the one that says today on the record I won't go extra judicial.  I will keep it tight on this.  I just want -- they know what I want.  I want an apology.

THE COURT:  Right.

MR. LUTHMANN:  That's the basic and carnal thing that I want.

THE COURT:  Right.

MR. LUTHMANN:  They lumped me in with a pedophile.  They lump me in calling me the most heinous thing that there can be given my religion, given my background, given my beliefs and given the laws of the State of Florida.  They put it on the books in 2022.  You have -- if you violate a child under the age of 12, you get put to death in this state, and I don't know if Mr. Norshirvan has that -- that they put that on the books, but DeSantis did.

156

THE COURT: There is a curious -- there's a lot of curiosities in the Florida Constitution and in the Florida statute books, and I remember Florida was my third bar, and I remember when studying for the Florida Bar thinking how crazy they were down here with their constitution because it's like that seems like that should be a statute everything under the sun is in the constitution down here. They even talk about -- they even regulate hog farming in the Constitution of Florida so anyway.

So anyway, that's my long way of getting to the fact that, yes, I understand on the statutes they define certain crimes as capital crimes, but that doesn't necessarily mean capital punishment. So anyway, just wanted to offer you some thoughts on that. Okay. What about that? You're probably familiar, and I don't know if you interchange any settlement discussions with -- or a settlement conference with the magistrate judge in the two other matters that you have. You've all done just private mediations so far?

MR. CHIAPPETTA: Private mediations so far.

THE COURT: But you are probably familiar that the magistrate judges here hold settlement conferences commonly in these cases.

MR. CHIAPPETTA:  Yes, Your Honor.  We are familiar with that.  Given the current posture, I don't necessarily know if it would be I guess a good idea at this point given the posture of the case with the other individuals.

THE COURT:  Are there other folks you think might need to be parties here at some point?

MR. CHIAPPETTA:  Absolutely.

MR. LUTHMANN:  Okay.

THE COURT:  So who are they thinking about -- well, we have a deadline for motions to amend and joint parties that might have already expired.

MR. LUTHMANN:  I think it's the 13th.  I think it's in a couple days.

THE COURT:  Um.

MR. LUTHMANN:  If we want to extend, I would ask, but I might have to (inaudible) --

THE CLERK:  9/12/2025.

MR. LUTHMANN:  Mr. McGivney --

THE COURT:  Just a second.

THE CLERK:  So three days.

THE COURT:  Oh, three days away is our deadline for those kinds of motions.

MR. CHIAPPETTA:  Well, I won't be bringing a motion, Your Honor.  I'll wait until I answer and file

158

a counterclaim.

THE COURT:  Okay.

MR. CHIAPPETTA:  In which case I'll be able to bypass that.

THE COURT:  Understood.  So you are thinking the counterclaim might potentially bring in other parties?

MR. CHIAPPETTA:  It will.  It will address the people who we believe paid for those Substack articles.

THE COURT:  I see.

MR. CHIAPPETTA:  Yeah.

THE COURT:  Wouldn't that be duplicative of what's already going on in the other cases?

MR. CHIAPPETTA:  No, not necessarily.

THE COURT:  Okay.

MR. CHIAPPETTA:  Technically, it would intertwine components, but it could be broken down by time frames, and so we would pick up here with a counterclaim essentially starting at a certain time whether it's June of '24 or October of '24 and moving forward, and it would actually lead to a different set of counter defendants and would include -- well, Mr. Luthmann would be included in that.

THE COURT:  Understood.

159

MR. CHIAPPETTA:  But there would be at least three or four other individuals as well.

THE COURT:  I see.  Understood.  Well, yeah. A lot of times people lose sight of the fact that in a counterclaim you can join additional parties, and it's still -- it's a counterclaim, not a third-party claim, and anyway, just nomenclature wise.  But well, before it gets -- I mean, you are already embroiled in litigation with the folks I imagine would be the other defendants counterclaim.

MR. CHIAPPETTA:  That would be correct.

THE COURT:  Okay.

MR. CHIAPPETTA:  Well, most of them anyway.

THE COURT:  All right.  And I wonder if maybe -- well, my thought was you're here.  Mr. Norshirvan has come all the way from Pennsylvania. You are here all the way from the east coast of Florida, and I mean, if you would like, I don't have anything else going on today.  If you want to try to take a run at some settlement discussions with me as your free moderator, I would offer my services and maybe we could have some -- trade some offers back and forth and see if we could at least put this one to rest.

MR. LUTHMANN:  They had made an offer

160

before.  I made an offer just before you took the bench about a retraction.

THE COURT:  All right.  Well, don't -- okay. Maybe don't give me the content yet of any offers.

MR. LUTHMANN:  Okay.

MR. CHIAPPETTA:  I appreciate Your Honor's offer, but I was appeared here today on the schedule, and I have two little league teams to coach this evening, and I really do not want to miss that.

THE COURT:  Understood.  Well, but Mr. Norshirvan might want you to think otherwise.  You're here on his dime, and maybe if we could get this case resolved today, he might want you to potentially make other arrangements.

MR. CHIAPPETTA:  I understand that, but given Mr. Luthmann's position that was provided this morning and our position that was provided at lunch or right after lunch, I don't -- I think we are far enough apart that it -- we won't get there today, and I'll just end up missing two little league baseball practices for I guess without having a good result or an outcome.

THE COURT:  Okay.

MR. LUTHMANN:  I'm going to say you never know unless you try.  The president says that a lot.

161

You never know unless you ask.  He sat down with Putin.  Maybe we get peace, maybe we don't, but you never know unless you try.  Right?

THE COURT:  It can be shocking sometimes. I've had many cases where we try to have a settlement discussion and both sides come in here and tell me, Your Honor, this is a total waste of time.  We're never going to resolve, and we do.  So -- but I understand.  I'm kind of springing this on you, and you probably had other plans.  Do you want to confer about it at all about maybe taking advantage of this opportunity?

MR. CHIAPPETTA:  One moment, Your Honor. Thank you.

THE COURT:  Okay.

(There was a discussion off the record.)

THE COURT:  Maybe we could even do it for just a bit.  I'm not saying we have to do it until 4 or 5:00.  Maybe we just take a run at it for maybe 30, 40, 60 minutes.

MR. CHIAPPETTA:  I have a two hour drive back into town.

THE COURT:  Right.

MR. LUTHMANN:  Give us a half-hour in earnest.

162

MR. CHIAPPETTA:  Um.

MR. LUTHMANN:  I feel --

THE COURT:  Again, I want you all to agree, and I don't mean to pressure you or anything.

MR. CHIAPPETTA:  Yeah.

THE COURT:  I want you all to agree it's worth while.

MR. CHIAPPETTA:  So here's the thing.  My client would agree to 30 minutes from right now that would put it at like 2:15 to go forward, but he has one condition and I would also need a restroom break before we began.

THE COURT:  No problem.

MR. CHIAPPETTA:  Our only condition to even agree to this is that one of the terms would be that you have to take down all of your Substacks that mention my client's name.

MR. LUTHMANN:  Is he going to take down everything that mentions my name?

MR. CHIAPPETTA:  That can be a discussion point.  You have to agree to that term before we'll agree to negotiate.

MR. LUTHMANN:  I'll agree to that term if he's going to do it.  I mean, I'm not going to give it up for nothing.  You ain't giving up something for

163

nothing.  Right?  So why would I do that?

THE COURT:  He's willing to put it on the table maybe subject to a goose gander rule.

MR. CHIAPPETTA:  Okay.  My client said that that's agreeable as far as both sides remove all content of the other.  I would just ask for a brief two minute break to use the restroom.  Then we can come back.

THE COURT:  No problem.  That's fine.

MR. LUTHMANN:  That's the first step, yeah.

MR. CHIAPPETTA:  Then I would also ask that this settlement conference be private.

THE COURT:  Yes.

MR. CHIAPPETTA:  I know there's other individuals that are here.  That should not be --

THE COURT:  It would be just like you would a mediator.  It would be confidential.  Anything you say, Mr. Norshirvan, you've been in some mediations with Mr. Burkett?

MR. CHIAPPETTA:  Yes, Your Honor.

THE COURT:  You've heard the spiel from a mediator before about it's all confidential.  Anything you say is not going to be shared outside of the context of the settlement discussions.

THE WITNESS:  I understand, Your Honor.

THE COURT:  Nobody could ever, you know, use it against each other and I would never tell anybody what you said or anything like that, and yeah, it's all confidential, and we just try to hand write a resolution.  And even if we don't get it done, maybe we make significant progress and you're that close and you can wrap it up before the next days or weeks without me.  Maybe we could -- I think it would be worthwhile to at least spend some time on it.

MR. CHIAPPETTA:  Okay.

THE COURT:  Okay.  Sounds good.  So why don't we do this logistically.  We'll adjourn this hearing.  We're done with this, and then Mr. Luthmann, I'll keep you in this room, and I'll put defense in the jury room behind that wall, and I can just go back and forth.

MR. CHIAPPETTA:  Okay.

THE COURT:  I take it you don't need to make any kind of mediation statements to each other.

MR. CHIAPPETTA:  No, nothing like that, Your Honor.  Before we --

THE COURT:  You've already -- I've seen some of the emails back and forth about Mr. Luthmann's offers, so I kind of get the gist of it.

MR. CHIAPPETTA:  Before we adjourn this

165

particular hearing, I just wanted to discuss that discovery issue.

THE COURT: Okay.

MR. CHIAPPETTA: Is that something that's going to require a motion or is that something that Your Honor can extend here today?

THE COURT: You -- you have pending discovery requests that you haven't responded to yet; right?

MR. CHIAPPETTA: I --

THE COURT: That's the issue?

MR. CHIAPPETTA: I believe Mr. Luthmann has sent something but it was -- it was sent -- from what I have here, it was sent to my service email address and it was quarantined. So I would need Mr. Luthmann to reserve me, and then I --

THE COURT: Well, you have them.

MR. CHIAPPETTA: Well, no. They're in quarantine, and whether or not I can actually pull them from a third-party quarantine --

THE COURT: Oh.

MR. CHIAPPETTA: -- I can't guaranty --

THE COURT: I see.

MR. CHIAPPETTA: -- based upon how my office is set-up, so I would ask Mr. Luthmann to provide

166

those documents to me again, and then for a fresh clock to start so I actually have a fair opportunity to review those documents.

THE COURT:  What are you talking about?  The interrogatories?

MR. LUTHMANN:  What I did was before he was on and we have to discuss that first.

THE COURT:  I'm sorry?

MR. LUTHMANN:  Before he came on, I put in the notices request for admit and I put in interrogatories that Mr. Norshirvan actually copied the Court.  So sorry that I did and I won't do it moving forward.

THE COURT:  Okay.

MR. LUTHMANN:  There's a record that was sent over 30 days ago.  It's my position that the request for admit are now as an operation of Federal Rules of Civil Procedure deemed admitted, and I was going to compel and file a motion and I wanted to meet and confer with Mr. Chiappetta and file a motion to have those deemed admitted and have the interrogatories compel answers to those interrogatories.

THE COURT:  So we have interrogatories, request for admission.  Do you have requests for

167

documents?

MR. LUTHMANN:  Then the second trench that I just sent a few days ago was a second set of notices to admit based on new evidence and a request for production, a robust request for production with ESI and all the metadata stuff and mine as well.

THE COURT:  Do you have the second set?

MR. LUTHMANN:  I sent that to the Court.

MR. CHIAPPETTA:  I think that's all that I was referring to.  I was not aware that a first was even sent, and based on my client's testimony, I think it's pretty clear he did not receive any e-mails from Mr. Luthmann as it relates to that discovery.

MR. LUTHMANN:  And I'm going to -- I'm willing to take this to a motion though because I believe the 30 days are there and this has been pending and he has knowledge of it and I don't want them to play possum to try to get an additional 30 days for something that I put in in due diligence.  But I have right here, and I'll tell the Court I have this prepped as part of the exhibits from before, but this is -- I have the transmission email and I'm going to hand it to Mr. Chiappetta and I have the request for admissions.

THE COURT:  Okay.  Well --

168

MR. LUTHMANN:  And I'll hand them to him right now in open court so the Court knows that I'm handing the request for admissions that was signed and dated and served on August 9 to Mr. Norshirvan at all of his email addresses.

THE COURT:  Okay.

MR. LUTHMANN:  Okay?

THE COURT:  Got it.  When was that again?

MR. LUTHMANN:  And mailed to his home.

THE COURT:  Okay.  When was that again?

MR. LUTHMANN:  Excuse me?

THE COURT:  The date?

MR. LUTHMANN:  That was -- this was August 9.  It was --

THE COURT:  All right.  Let me offer two notes on this.  One, as our discovery handbook talks about, you know, some extensions to discovery response times are routine, and we certainly expect you all to pretty much grant that to each other liberally.  So it would not be unusual at all for one side to say hey, I need another 30 or 60 or 90 days to -- 30 or 60 days to respond in addition to the 30 that I already get.

MR. LUTHMANN:  Okay.

THE COURT:  And then also the request for admission point.  Yes, the rule does read the way it

169

reads, but unfortunately, when you look at some -- unfortunately, I think from Mr. Luthmann's perspective, the case law just doesn't bear that out, especially, look, there's plenty of published circuit law out there saying it's not like a default situation where you don't answer the complaint.  It's a failure to respond to request for admissions and not necessarily binding as in the way -- you know, despite the way the rule reads.

So given that case law, I think we're better served just allowing them time to just go ahead and respond, and also, you know, those things -- another thing in the case law is those things need to be really tailored to very narrow things, not broad based merit type questions.  Your typical RFA request for admission would be something like some of the things you asked Mr. Norshirvan today on the stand.  You know, just do you go by any other names, where do you live, all of those kinds of things, very pinpoint type facts.  So those are the things the RFA should be going to and not much else.  So anyway, let me offer all that and let you confer about it and let me know if you can't figure it out.

MR. LUTHMANN:  All right.  So I want just a clearing house then and we can all have our discovery

170

and be clear that we're all putting discovery in and this is the date.  I'd love for us to have a schedule whereby maybe we could get it so ordered by the Court that says we are all going to have everything by a certain date.  Then we're going to have X amount of days where we --

THE COURT:  Have they served discovery requests on you yet?

MR. LUTHMANN:  I don't even know.  I haven't seen them.  I don't know what he sent me.  I don't know what he did.  So --

MR. CHIAPPETTA:  Okay.

THE COURT:  Well.

MR. CHIAPPETTA:  Discovery was served by my paralegal close to almost a month ago now, but the issue I have with setting a date is I was only given a request for admissions, the first set.  I was not given these documents here nor was I given the first set of interrogatories.

THE COURT:  No, I'm not going to set it right now.  I'm going to let you confer about it all informed by what I just said, that we think it's customary for folks to as a courtesy give each other 30, 60 additional days.  That's routine and also the request for admission point, just given the case law

171

that does -- the failure to respond within 30 days doesn't really have the impact that the rule would suggest.

MR. LUTHMANN:  If he wants to restart the clock, I'll restart the clock for him, he restarts the clock for me, and we can agree on a schedule.

THE COURT:  All right.

MR. LUTHMANN:  If that's the least we get done today on mediation.

MR. CHIAPPETTA:  Your Honor?

THE COURT:  There we go, making progress on that too.

MR. CHIAPPETTA:  The final point that I would just bring up which is that I'm sure that this Court has been CCed on as well is Mr. Luthmann's absolute refusal to comply with Local Rule 3.01G and communicate telephonically.

THE COURT:  Yeah.  Well, I think that goes both ways.  I mean, obviously Norshirvan is blocking Luthmann this whole time until you came on the case really wasn't compliant with 3.01G either.  So -- and we often struggle with how to handle that when we have pro se parties.

MR. CHIAPPETTA:  Your Honor, what I'm getting at is that Mr. Luthmann is refusing to

172

communicate with my office now via telephone and requesting an in person meeting which is impossible because I'm not going to drive two hours.

THE COURT:  Sure.

MR. CHIAPPETTA:  It's unreasonable really to drive two hours to meet with him face-to-face at this courthouse.

THE COURT:  Yeah.

MR. CHIAPPETTA:  And he's refusing any other form of communication.  So in order to comply with the local rule, I would request that the Court advise him that telephonic means are generally accepted and that he should be following that --

THE COURT:  Well, you should.  I mean --

MR. CHIAPPETTA:  -- local rule.

THE COURT:  -- Mr. Chiappetta and Mr. Luthmann should be able to speak on a phone in a civil and courteous matter, business like matter about things like, hey, I need a few more days or I need a few more pages, that kind of thing.  I mean, you should be able to do that, and about maybe the substantive motions I was thinking what I could do as a substitute is require you all to serve motions on each other three or four days before you file them, and that way the other side has it.  They can offer

173

thoughts about, hey, I don't have a problem with that, or if you just change this, I'm good, that kind of thing, and if because if you can't confer, I got to come up with a substitute.

MR. LUTHMANN:  I have no problem with that, that's fine.  I'll tell the issue that I have is this.  And I put it in the papers is, you know, fool me once, shame on you, fool me twice, shame on me.  I feel as if the things that we say are what is reflected in the certification.  So it might have been a mistake in time with two days September 11 versus September 15.

THE COURT:  Oh, yeah.  I remember that.

MR. LUTHMANN:  But you know, I said 30 days and the 30 days was the 30 days, but then it happened again where he mischaracterized the fact that I wanted to speak and have a record.  So I either wanted to do it in person or I wanted to do it in writing or I wanted to do it through the mail or email or whatever.  These are all formal ways in 3.01G it can happen.  It doesn't necessarily contemplate a telephone call, and in the State of Florida where it's a two party consent state, it makes almost email even better because you have a full record of going back and forth.

THE COURT:  Well, on that score, you both traded e-mails on that extension of time, and you

174

still get on the same page with each other.  So I don't know if it's necessarily a cure all, and obviously, you can video conference each other, but anyway, and then again, like I said, the email that came across at 2:30 in the morning is much more the form that e-mails should be taking from here on out.

MR. CHIAPPETTA:  Yes, Your Honor.

THE COURT:  If you keep it that way, I think we'll be good, and I would encourage you to try to either talk orally on the phone or maybe engage each other on the video conference about other things to satisfy 3.01G, and if you can't, if you can't bring yourselves to do it, then at least serve a motion on each other three days before you -- 72 hours before you file it with us, so that way each side at least has an opportunity to say I don't oppose that and you can tell the Court.  All right?  All right.

MR. LUTHMANN:  Given the Court's words and kind words, I will give Mr. Chiappetta another chance and I will earnestly act and try to act with him in good faith and believe that he's acting the same way.

THE COURT:  Well, I think both sides want that.  All right.  Do you want to take a quick bathroom break and maybe we can have a discussion for about 20 minutes?

Case 2:25-cv-00337-KCD-NPM     Document 89     Filed 09/30/25     Page 175 of 175 PageID 1989

175

MR. CHIAPPETTA:  Yes, Your Honor.  Thank you.

THE COURT:  Okay.  Very good.  Let's adjourn this hearing.  Thank you.

(Proceeding concluded at 1:58 p.m.)


CERTIFICATE OF COURT REPORTER

I certify that this is a true and accurate record of proceedings in the United States Magistrate Court for the Middle District of Florida before the Honorable Nicholas P. Mizell on September 10, 2025.


S/ Brandi A. Wilkins

Brandi A. Wilkins

Official Court Reporter